UNITED STATES of America, Appellee,

v.

Nestor URIBE, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Leon Alberior RAVE–ARIAS, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

David RASH, Defendant, Appellant.

Nos. 88–1837 to 88–1839.

United States Court of Appeals, First Circuit.

Nos. 88–1837 and 88–1838 Heard Nov. 6, 1989.

No. 88–1839 Submitted Nov. 6, 1989.

Decided Dec. 4, 1989.

Charles J. Rogers, Jr., Providence, R.I., for defendant, appellant, Nestor Uribe.

Norman E.V. D'Andrea, Providence, R.I., by Appointment of the Court, for defendant, appellant, Leon Alberior Rave–Arias.

David Rash, New Orleans, La., on brief pro se.

James H. Leavey, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief for the U.S.

Before BREYER and SELYA, Circuit Judges, and VAN GRAAFEILAND,* Senior Circuit Judge.

SELYA, Circuit Judge.

A federal grand jury indicted defendants Nestor Uribe, Leon Alberior Rave–Arias (Rave), and David Rash, appellants before us, on various conspiracy and drug trafficking charges, and for aiding and abetting. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), 846; 18 U.S.C. § 2. Following a five day jury trial, defendants were convicted on all counts. Their motions for new trial, submitted in the ordinary course and form, were denied. Close to four weeks after the verdict, Uribe docketed a second motion for new trial. In it, he asserted that one of the petit jurors knew him and might, therefore, have been biased against him. Rash also filed a supplemental motion suggesting that Uribe's tie to the juror tainted Rash's conviction. The district court held an evidentiary hearing and denied both motions.

We have reviewed the gaggle of claims raised on appeal, and find them meritless. Accordingly, we affirm the convictions.

* Of the Second Circuit, sitting by designation.

## I. BACKGROUND

We set forth the evidentiary predicate in the light most generous to the prosecution, as caselaw requires. *See, e.g., United States v. Ingraham*, 832 F.2d 229, 230 (1st Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Cintolo*, 818 F.2d 980, 983 (1st Cir.), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

In May 1987, the government applied for, and received, a court order authorizing electronic surveillance of a telephone at Uribe's home in West Warwick, Rhode Island. The order authorized the wiretap for a period of 30 days. It was thereafter twice renewed. Early on, agents of the Federal Bureau of Investigation (FBI) intercepted three calls from Uribe and his wife to Rash. The conversations concerned arrangements for the purchase of kilogram quantities of cocaine. Hard upon the last of these contacts, FBI agents observed Rash and the Uribes meeting at a restaurant in Warwick, Rhode Island. In July, another telephone conversation took place involving the delivery of a half-kilogram of cocaine.

On August 14, 1987, a call was intercepted in which Rash advised Uribe, in code, that he wished to buy a kilogram of cocaine. Uribe telephoned Rave and arranged to meet him at Rhode Island Hospital. Shortly thereafter, agents observed Uribe enter the hospital and leave a few moments later. When Uribe placed another call to Rash, the latter reaffirmed his acquisitive interest. Uribe relayed the request to Rave, who agreed to meet Uribe at a Warwick eatery. Agents later saw Uribe and Rave in the restaurant's parking lot. They watched as Rave gave Uribe a brick-shaped object, which Uribe inserted into a blue shoebox. After placing the shoebox into his vehicle, he drove to a park in Worcester, Massachusetts. Rash was there. Uribe, carrying a rectangular package in a plastic bag, entered Rash's automobile. He left the vehicle without the package. Rash departed.

In a matter of minutes, police rang down the curtain. The officer who stopped Rash's car retrieved from within it a blue shoebox containing 1,007 grams of cocaine (75% pure), having a street value over $225,000. Arrest, indictment, trial, and conviction followed apace.

On appeal, we deal with the myriad assignments of error in what seems to us a logical order. Certain points briefed and argued are not discussed because we have found them to be so patently unmeritorious as to render comment superfluous.

## II. SUPPRESSION OF THE INTERCEPTS

In the district court, defendants unsuccessfully attempted to suppress the contents of Uribe's recorded telephone conversations with Rave and Rash, respectively. Uribe and Rave press the attack on appeal. They make two main arguments.

### A. *Less Intrusive Means.*

The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1982) (Title III), declares that a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). As we have explained: "The basis for the statutory monition is the salutary notion that the sovereign should make a reasonable, good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls." *United States v. Hoffman*, 832 F.2d 1299, 1306–07 (1st Cir.1987); *see also United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir.1989). In this case, the claim that the investigation could have been efficaciously carried out using less intrusive means is unfounded.

Title III demands a practical, common-sense approach to exploration of investigatory avenues and relative intrusiveness. In essaying such an approach, the type of crime is important. By its very nature, interstate drug trafficking is hard to pin down. Surely, "the law was not meant to

force the government to run outlandish risks or to exhaust every conceivable alternative before seeking a wiretap." *Hoffman*, 832 F.2d at 1306. Here, we think the necessary predicate was laid: supporting documents filed by the government carefully detailed a variety of investigative procedures which had been utilized, set out a solid basis for believing that drugs were being sold, and explicated the need for more sophisticated inquiry. Defendants do not cast any real doubt on the scope or sincerity of the government's earlier investigatory efforts, nor do they convincingly suggest what else, short of electronic surveillance, the FBI might fruitfully have attempted to further the probe. The wiretap was appropriate.

### B. *Minimization.*

■ Next, Uribe and Rave assert that the government failed to minimize its eavesdropping and that, consequently, the intercepted conversations should be suppressed. This claim has its genesis in the congressional mandate that all electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). In Title III, Congress "set out to provide law enforcement officials with some of the tools thought necessary to combat crime without unnecessarily infringing upon the right of individual privacy." *Scott v. United States*, 436 U.S. 128, 130, 98 S.Ct. 1717, 1719, 56 L.Ed.2d 168 (1978). The minimization requirement, then, "spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects." *Hoffman*, 832 F.2d at 1307.

The touchstone in assessing minimization is the objective reasonableness of the interceptor's conduct. *See Scott*, 436 U.S. at 137, 98 S.Ct. at 1723. The government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required. "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the

agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Id.* at 140, 98 S.Ct. at 1724. Compliance determinations are necessarily fact-specific; because circumstances vary, "there can be no inflexible rule of law which will decide every case." *Id.* at 139, 98 S.Ct. at 1724. As we have written: "The facts and circumstances of the particular investigation ... comprise a critical integer in the minimization equation." *Hoffman*, 832 F.2d at 1308. Some general guidance is nevertheless available. Once a wiretap has been duly authorized, we have been prone to look hardest at three relevant areas in assessing compliance: the nature and complexity of the suspected crimes; the thoroughness of the government precautions to bring about minimization; and "the degree of judicial supervision over the surveillance practices." *United States v. Angiulo*, 847 F.2d 956, 979 (1st Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988).

Where, as here, the indagation concerns a drug ring, the sweep of which is unknown, "the need to allow latitude to eavesdroppers is close to its zenith." *Hoffman*, 832 F.2d at 1308. In such a case, the wiretap not only serves to "incriminate the known person whose phone is tapped, [but] to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy." *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir.1975). Because such conspiracies frequently utilize codes and specialized jargon, making criminal conversation more difficult to detect and decipher, there is yet an added reason for affording investigators some leeway. *See Hoffman*, 832 F.2d at 1308; *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1976); *Quintana*, 508 F.2d at 874 n. 6. The instant investigation, which focused on an interstate drug ring using encoded communications, was built to such a last: given the nature of the criminal activities and jargon, it was reasonable for the agents to monitor Uribe's telephone almost continuously. *See, e.g., Angiulo*, 847 F.2d at 979.

In this case, moreover, the government presented evidence which warranted the

district court in concluding that the surveillance was managed reasonably; that due precautions were taken not to overreach; and that monitoring of nonrelevant calls was terminated as soon as practicable. The record also indicates responsible judicial supervision: the government's application for the intercept order was supported by a detailed affidavit; the order was limited to a single telephone; and it was renewed only twice (each time after a studied reevaluation). There was no proof of an offsetting nature. Defendants offered no evidence tending to show, or even to suggest, a pattern of listening to calls after it became clear that the calls were innocuous. They likewise presented no evidence that the government could have utilized a more effective procedure for minimization. From what we can tell, the FBI cut its electronic surveillance reasonably close to the bone. That a few fragments of innocent conversations were overheard cannot be viewed as a violation of the minimization requirement. *See Scott*, 436 U.S. at 142–43, 98 S.Ct. at 1725–26.

We need not cart coals to Newcastle. In this case, the *Angiulo* factors point unerringly toward the validity of the challenged evidence. The district court supportably found that defendants were "unprepared or unwilling to suggest ... what else the Government might have done in the circumstances to avoid the inadvertent interception of communications which had nothing to do with the investigation." The court further found, again supportably, that the FBI agents had made reasonable, good-faith efforts to minimize. Because the interceptors' conduct was reasonable under the circumstances, the evidence obtained was not excludable on the basis of Title III's minimization requirement, 18 U.S.C. § 2518(5).[1]

---

1. We need not reach, and again leave open, the question of whether (and if so, under what circumstances) total suppression of intercepts may be a concinnous remedy for a particularly egregious failure to minimize. *See Hoffman*, 832 F.2d at 1309 (discussing, but declining to decide, same question).

## III. VENUE

Rash complains that the indictment, as to him, was not properly triable in Rhode Island. He bases this contention on the fact that he never had possession of the contraband, actual or constructive, within the district. The argument cannot withstand scrutiny.[2]

■ The right of vicinage is constitutional in origin and dimension. "The Trial of all Crimes ... shall be held in the State where said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." U.S. Const. art. III, § 2. To deal with continuing offenses such as conspiracy, Congress enacted 18 U.S.C. § 3237(a) (1982), establishing that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." This proviso was originally enacted as part of a statute defining conspiracy, and has regularly been applied in conspiracy cases. *See United States v. Cordero*, 668 F.2d 32, 43 n. 17 (1st Cir.1981). As to the conspiracy charge (count one), it is clear beyond peradventure that venue was proper so long as any act in furtherance of the conspiracy was committed in the district (even if a particular conspirator was not himself physically present there). *See id.* at 43; *see also Palmero v. United States*, 112 F.2d 922, 926 (1st Cir. 1940). "Venue is sustained either by proof that the conspiracy or an overt act occurred in the district." *Galatas v. United States*, 80 F.2d 15, 24 (8th Cir.1935). In this instance, the telephone calls to and from Rhode Island, and the easily inferable interchange of narcotics between Rave and

---

2. Defendant Rave, apparently believing that imitation is the sincerest form of flattery, also challenges venue. For one in Rave's shoes, the argument is nothing short of silly. The evidence showed the transfer of over 500 grams of cocaine by Rave (to Uribe) in Warwick, Rhode Island. Venue is, of course, appropriate where the offense actually transpired. *See* Fed.R. Crim.P. 18.

Uribe at the Warwick restaurant, were ample to warrant prosecution of the conspiracy charge in Rhode Island. *See id.*

 Having established that venue was properly laid on the conspiracy count in Rhode Island, we need not linger long as regards the substantive count wherein Rash stood accused (count three). That count charged in *haec verba:*

> That on or about August 14, 1987, in the City of Warwick, in the District of Rhode Island and elsewhere, the defendants, Nestor Uribe and David Rash, did knowingly and intentionally possess with the intent to distribute in excess of 500 grams of a mixture or substance containing a detectible amount of cocaine, a Schedule II Controlled Substance;

> In violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B)(ii) and Title 18, United States Code, Section 2.

It is apodictic that "when Congress desires to give a choice of trial, it does so by specific venue provisions giving jurisdiction to prosecute in any criminal court of the United States through which a process of wrongdoing moves." *United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944). Such is the situation at bar.

 Where a continuing offense (such as possession with intent to distribute) is involved, venue is proper wherever the crime takes place, including the spot where it originates. *United States v. Stitzer,* 785 F.2d 1506, 1519 (11th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986); *United States v. Zwego,* 657 F.2d 248, 251 (10th Cir.1981) (similar; charge brought under 18 U.S.C. § 1014), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1275, 71 L.Ed.2d 460 (1982); *cf. United States v. Sandini,* 803 F.2d 123, 128 (3d Cir.1986) (under § 3237(a), venue proper for drug importation wherever contraband moved), *cert. denied,* 479 U.S. 1093, 107 S.Ct. 1306, 94 L.Ed.2d 161 (1987); *United States v. Gray,* 626 F.2d 494, 498 (5th Cir.1980) (im-

portation of controlled substance is a continuous crime, not completed until contraband reaches its final destination; venue is proper in any district along the way), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1367, 67 L.Ed.2d 346 (1981).

To be sure, more than a *de minimis* connection is required—but here, the triangular nexuses between the accused, the offense charged, and the forum are solidly conjoined. Rash placed a call to Rhode Island to arrange for the purchase. The cocaine was thereafter given to a courier in Rhode Island and brought to Massachusetts in response to the "order" which Rash had placed. The sequence was continuous and unbroken. This was more than enough to allow venue to be laid in Rhode Island on count three.[3] *See United States v. Cattle King Packing Co.,* 793 F.2d 232, 239 n. 4 (10th Cir.) (venue lies in all districts "used to commit the crime"), *cert. denied,* 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986); *see also United States v. Gillette,* 189 F.2d 449, 452 (2d Cir.) (section 3237 broadens the venue rules inherited from English law), *cert. denied,* 342 U.S. 827, 72 S.Ct. 49, 96 L.Ed. 625 (1951); *cf. United States v. Cashin,* 281 F.2d 669, 674–76 (2d Cir.1960) (Lumbard, C.J.) (court of appeals refuses writ of prohibition, ruling that, although mailings constituting securities offense took place in New York, case could be prosecuted in Alabama, where scheme had been hatched).

## IV. JUROR BIAS

The briefs on appeal raise several issues concerning Rodriguez, a seated juror. We address both the juror's previous interaction with the parties (a point which affects different parties in different ways) and his criminal record.

### A. *Previous Interaction.*

 The defendants were convicted on January 21, 1988. Each of them filed an immediate, timely motion for a new trial on boilerplate grounds. The motions were de-

---

**3.** Because we find venue was appropriately laid under a "continuing offense" theory, we need not reach the government's alternative assertion

that venue existed as to Rash in Rhode Island because he aided and abetted Uribe's possession there. *See* 18 U.S.C. § 2.

nied on February 16. On that date, Uribe advised the district court for the first time that he knew one of the sitting jurors. He subsequently moved for a new trial on that basis. Rash filed a like motion.[4]

At a hearing in the district court, Uribe testified that both he and Rave recognized the juror during empanelment; that Rodriguez was an automobile mechanic who had repaired Uribe's car; that Uribe had not paid him; and that "hard feelings" existed as a result of the transaction. Uribe claimed that he did not tell his attorney about his run-in with Rodriguez until after the verdict was returned, because he "expected that the man would act properly and correctly and as an Hispanic." The juror told a slightly different tale, testifying that his dealings were with Rave, not Uribe; that he had rented Rave a hoist and experienced some problems getting it back; but that, after some travail, Rave returned the equipment and paid for its use.[5]

■ 1. *Effect on Uribe.* Fed.R.Crim.P. 33 requires motions for new trial on grounds other than newly discovered evidence to be filed within seven days of verdict. Uribe endeavors to shoehorn his motion into the Rule 33 exception, but there is no fit; the "newly discovered" evidence asserted in Uribe's motion, filed 41 days after verdict, was not "newly discovered" at all.

Motions for new trial based upon an assertion of newly discovered evidence must indicate that "(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeach-

ing; and (4) it will probably result in an acquittal upon retrial of the defendant." *United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980). Uribe stumbles on the first step of the ladder. Whatever relationship existed between Uribe and Rodriguez was unquestionably known to the movant before jury selection ended. Indeed, the court below found, supportably, that Uribe expressed the hope, at the time of empanelment, that Rodriguez "would be selected and serve as a juror." A sentient defendant, knowledgeable of a possible claim of juror bias, waives the claim if he elects not to raise it promptly. *See United States v. Costa,* 890 F.2d 480, 482 (1st Cir.1989) (collecting cases). In short, Uribe cannot now be permitted to escape the consequences of his earlier knowledge or to reverse his previous position simply because he gambled and lost. Uribe's motion was duly denied as untimely.

■ 2. *Effect on Rash.* Rash has considerably greater purchase on an argument of this genre. There is no evidence that he or his counsel knew of any relationship involving Rodriguez until Uribe first made the disclosure in open court. Nor can Rash's ignorance plausibly be attributed to lack of diligence. Even so, we do not see how the contretemps could have had any cognizable impact on this appellant.

We start with bedrock:

> A juror ... need not be disqualified merely because he or she knows the defendant or has some knowledge about the case.... A defendant must show that the knowledge somehow impaired— or had the ineluctable tendency to impair—the juror's neutrality. That is to say, the defendant must show actual, or

---

**4.** Although Rave also attempts to argue that Rodriguez's presence tainted his conviction, he never raised the matter below. He is, therefore, foreclosed on appeal. *See, e.g., United States v. Figueroa,* 818 F.2d 1020, 1025 (1st Cir.1987); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 760 (1st Cir.1985). Surely, the raise-or-waive rule is fully operative in respect to these rulings. *See United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.) (defining "plain error"), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *see also United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816

(1982) (plain-error doctrine to be invoked "sparingly" and only to avert "miscarriage of justice").

**5.** The trial judge hinted broadly that there was "some basis" for the "real" possibility that neither Uribe nor Rodriguez told the truth at the evidentiary hearing. We need not plumb those depths because, whatever story is to be believed, the new trial motions were properly denied. *See infra.*

at least likely, prejudice stemming from the participation of the allegedly biased juror.

*Neron v. Tierney,* 841 F.2d 1197, 1206 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *see also United States v. Rivera–Sola,* 713 F.2d 866, 874 (1st Cir.1983) (defendant seeking new trial because of juror's nondisclosure must demonstrate actual prejudice or bias); *United States v. Vargas,* 606 F.2d 341, 344 (1st Cir.1979) (similar).

In this case, no prejudice was shown. Certainly, the interaction was not presumptively prejudicial: neither Uribe's version of the facts, nor Rodriguez's, sounds a particularly jarring note. That Uribe may have had a disagreement with the juror over a small bill, or that Rave may have been a few days late in returning a hoist, would scarcely be enough to warrant an assumption that serious hostility toward the person(s) involved would have survived the incident. And on either account, Rash was uninvolved. The district court's conclusion that Rash failed to demonstrate actual or likely bias appears unimpugnable. Consequently, Rash's motion for retrial on the grounds of newly discovered evidence was appropriately rejected.

### B. *The Prior Conviction.*

Defendants also claim that they were deprived of a fair, impartial jury because the same juror, Rodriguez, had been convicted of a felony. This information surfaced when, at the posttrial evidentiary hearing just described, the judge observed that the juror had completed a jury qualification questionnaire in which he mentioned the prior conviction. The judge went on to relate that he had taken Rodriguez's guilty plea; sentenced him; and later, on the recommendation of a probation officer, relieved Rodriguez of further restitutionary responsibility. All of these events occurred well before empanelment in the instant case.

We have difficulty making much sense of defendants' argument in this respect. They contended below that, because the juror was the beneficiary of "lenient treatment" by the district judge, he should not have been permitted to participate in their trial—the implication being that persons who had been treated "kindly" by a particular judge would, as jurors, be more likely to vote in favor of convicting defendants. On appeal, defendants' focus is even blurrier: whether the juror was favorably or unfavorably disposed toward the court, they ruminate, he must have been biased in some indeterminable way. And, they assert for the first time a claim of ineligibility.

■ Appellants miss the mark by a wide margin. For one thing, 28 U.S.C. § 1865(b)(5) (1982), which bars certain felons from acting as jurors,[6] does not implement a constitutional bar to jury service, but establishes a statutory impediment. Like so many statutory rights, the right to exclude felons must be affirmatively invoked; the Jury Selection and Service Act of 1968 (JSSA), 28 U.S.C. §§ 1861–78, establishes strict procedural requirements for challenging ineligible jurors. In general, a defendant must assert his rights "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier...." 28 U.S.C. § 1867(a). Inasmuch as (1) Rodriguez completed the questionnaire truthfully and divulged his prior conviction, and (2) jury questionnaires are available to defense counsel upon motion, prior to empanelment, under the district court's juror selection plan, defendants seemingly waived the point. *Compare, e.g., Government of the Virgin Islands v. Rosado,* 699 F.2d 121, 124–25 (3d Cir.) (objection to court's use of passers-by as jurors waived by want of timely objection), *cert. denied,* 464 U.S. 832, 104 S.Ct. 113, 78 L.Ed.2d 114 (1983); *United States v. Kennedy,* 548 F.2d 608, 610–14 (5th Cir.) (same;

---

**6.** The statute provides that no person shall be deemed qualified for federal jury service if he or she "has been convicted in a State or Federal court ... of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." 28 U.S.C. § 1865(b)(5) (1982).

use of "volunteer" jurors), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *see also* 28 U.S.C. § 1867(e) (procedures prescribed by statute comprise "exclusive means" for arguing that jurors "not selected in conformity with the provisions of [JSSA]").

■ In the second place, there was no prejudice. The fact that a juror technically should have been disqualified, and was not, does not automatically require a new trial. Rather, even if the problem had been unknowable at an earlier date, appellants would still have to shoulder the burden of establishing harm.[7] *See United States v. Currie,* 609 F.2d 1193, 1194 (6th Cir.), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1979); *United States v. Silverman,* 449 F.2d 1341, 1344 (2d Cir.1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972). As we have said:

> Where an attack is made upon the integrity of the trial by reason of alleged misconduct on the part of a juror in failing to disclose information pertinent to the issue of prejudice, the defendant's burden of proof must be sustained not as a matter of speculation, but as a demonstrable reality.

*Vargas,* 606 F.2d at 344–45 (quoting *United States v. Whiting,* 538 F.2d 220, 223 (8th Cir.1976)); *see also Rivera–Sola,* 713 F.2d at 874; *cf. United States v. Cepeda Penes,* 577 F.2d 754, 759 (1st Cir.1978) (declining to set aside conviction where defendant claimed that one juror could not speak or understand English). Because the district court is closer to the action and has a better "feel" for the likelihood that prejudice sprouted, we apply a highly deferential standard of review. "Although the question of juror impartiality is a mixed question of law and fact, the trial court's findings of impartiality will be set aside only where 'manifest' prejudice to the defendant has been shown." *Vargas,* 606 F.2d at 345 (quoting *United States v. Mulligan,* 573 F.2d 775, 778 (2d Cir.), *cert. denied,* 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978)).

In this case, the statutory violation—allowing a convicted felon to serve—did not implicate the fundamental fairness of the trial or the defendants' constitutional rights. It can, therefore, hardly be thought "substantial." *Compare, e.g., United States v. Phisco Ramirez,* 884 F.2d 1524, 1529–30 (1st Cir.1989); *United States v. Nelson,* 718 F.2d 315, 318–19 (9th Cir.1983); *United States v. Bearden,* 659 F.2d 590, 602 (5th Cir.1981), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). Appellants' claim thus reduces to one based on actual or likely bias. The district court found not the slightest basis to conclude that the juror's prior conviction, sentence, or subsequent dealings with the court rendered him more prone to convict a defendant in an unrelated case. We agree. To be accorded weight, a bias claim requires more than subjective characterizations unanchored in the realities of human experience. Short of constitutional error or some more substantial violation of the JSSA, there must at least be a plausible link between the predicate facts and the prejudice claimed before retrial can be ordered. None was demonstrated here.

## V. RAVE'S SENTENCE

■ The final brick in the edifice is Rave's contention that the nine year sentence meted out by the trial court was so harsh as to constitute an abuse of discretion. Though the rhetoric is purple and the imagery blood-red, the argument is frivolous.

"The trial judge has broad discretion in pronouncing criminal sentences, and a sentence within the statutory limits is not ordinarily subject to review." *United States v. Pasarell,* 727 F.2d 13, 17 (1st Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). As we recently reiterated, "[i]f there is one rule in the federal criminal practice which is firmly established, it is that the appellate court has no control over a sentence which is within the limits allowed by a statute." *United States v. Ruiz–Garcia,* 886 F.2d 474, 476

---

7. We emphatically reject the appellants' suggestion that we, unlike our sister circuits, adopt a *per se* rule mandating automatic retrial whenever an ineligible juror happens to sit.

(1st Cir.1989) (quoting *Gurera v. United States,* 40 F.2d 338, 340–41 (8th Cir.1930)). In Rave's case, the sentence fell well within the statutory parameters. There was not the smallest hint that the sentence was mechanistically imposed, *cf. United States v. Jimenez–Rivera,* 842 F.2d 545, 548 (1st Cir.) (discussing sentencing court's duty to consider individual circumstances of each offender), *cert. denied,* — U.S. —, 108 S.Ct. 2882, 101 L.Ed.2d 917 (1988), or that it was otherwise flawed. In short, the defendant has offered no persuasive reason for believing that the district court abused its wide discretion in imposing sentence.

Rave's only substantive argument on the point embraces the sentencing guidelines (Guidelines), promulgated pursuant to the Sentencing Reform Act of 1984, as amended, 18 U.S.C.A. §§ 3551–3586 (West 1985 & Supp.1988); 28 U.S.C.A. §§ 991–998 (West Supp.1988). Although conceding that the Guidelines do not apply to his case—the instant charges arose in the summer of 1987; the Guidelines apply only to offenses committed after November 1, 1987, Sentencing Act of 1987, Pub.L. No. 100–182, 101 Stat. 1266 (1987)—Rave suggests that the Guidelines were entitled to great weight in the sentencing determination, and did not receive it. He is wrong. In this pre-Guidelines case, the district court was free to disregard the Guidelines and exercise its sound discretion in formulating a condign sentence within the statutory limits. *See United States v. Twomey,* 845 F.2d 1132, 1135 (1st Cir.1988).

## VI. CONCLUSION

We need go no further. On this record, it is abundantly clear that the defendants were fairly tried and justly convicted. The evidence against them was nothing less than overpowering. Legal error not appearing, the judgments below must be *Affirmed.*