# United States Court of Appeals
## For the First Circuit

No. 16-1060

BRIAN and MELISSA FARIA,

Plaintiffs, Appellants,

v.

HARLEYSVILLE WORCESTER INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

John B. Harwood, with whom McKinnon & Harwood LLC was on brief, for appellants.
Kevin J. Holley, with whom Gunning & LaFazia, Inc. was on brief, for appellee.

March 24, 2017

**THOMPSON**, **Circuit Judge**. Jury selection is a fundamental step in our legal process, and when juror-screening mechanisms do not function as they are meant to, we end up faced with situations such as the one in this case: a post-verdict discovery that an individual served as a juror when he should not have cleared preliminary procedural hurdles due to a prior felony conviction prompted a new-trial motion challenging the jury's verdict. But even though this individual slipped through the qualification cracks, his inclusion is not fatal to the jury's verdict. We conclude that the district court properly denied the new-trial motion.

## The Case

In March 2012, Brian Faria was injured in a car accident, which he claimed was caused by a reckless highway driver who cut him off. Eventually, Mr. Faria and his wife (collectively, "the Farias") brought a lawsuit against their insurance carrier, Harleysville Worcester Insurance Company ("Harleysville"), claiming that Harleysville had incorrectly denied coverage under the uninsured motorist provision of his automobile insurance policy. Litigation proceeded in the normal course, and, ultimately, the case was slated for a jury trial.

A prospective juror by the name of John R. Rieger ("Mr. Rieger") was randomly selected for jury service, and he received

a juror qualification form by mail.[1]  When completing his form, Mr. Rieger selected "Yes" in response to a question asking whether he had ever been convicted of a crime for which punishment could have been more than one year in prison.[2]  Following the form's instructions, Mr. Rieger elaborated in the "Remarks" section:  he represented that the date of the offense was "Feb. 1995," the date of the conviction was "2000-2001," and he served eighteen months of the four-year sentence imposed.  He also selected "Yes" in response to the question "Were your civil rights restored?" and specifically wrote "Voting Rights."  As per the qualification form's instructions, he returned it to the clerk of court, however, he did not sign (under penalty of perjury) and date the form as required.

Fast-forward to voir dire on August 4, 2015, at which point counsel for the Farias asked the summoned panel, amongst other things, whether "anyone [had] served as a juror in another case, whether it be criminal or civil?"  He also asked them questions designed to ferret out their knowledge of personal injury claims, such as whether any of them, or anyone they personally knew, had made such a claim.  And continuing with questioning

---

[1] We discuss the specifics of the jury selection system, including juror qualification forms, in more detail below.

[2]  Mr. Rieger apparently believed his answer would render him ineligible to serve; he lists his response to that question as the grounds upon which he wished to be excused.

centered on civil litigation, he asked whether "anyone, any relative, children, husbands, uncle, aunts that are very close to you, any of them been a Plaintiff or a Defendant in a case?" Mr. Rieger remained silent in response to these questions.

When the jury was empaneled on August 4, 2015, it included Mr. Rieger. Trial began on August 24, 2015, and the jury's unanimous verdict, announced -- yes -- by foreperson Rieger, was for Harleysville.

But twelve days later, the Farias filed a motion for a new trial after learning that Mr. Rieger had been convicted in Rhode Island state court of assault with a dangerous weapon in 1997, and he had been sentenced to fifteen years' imprisonment, with four years to serve, as well as an eleven-year suspended sentence that would run concurrently with probation.[3] And due to his state court appeal, his sentence was not executed until March 23, 2001, meaning he was on a suspended sentence and probation at the time he served on the jury. The Farias contended that Mr. Rieger was not qualified to serve on the jury under 28 U.S.C. § 1865(b)(5).

Ruling on the new-trial motion, the district court found that following his conviction, Mr. Rieger's civil rights had not

---

[3] How the Farias learned of Mr. Rieger's felon status is not clear -- two explanations were advanced. But we do not need to resolve this mystery to reach the issues before us.

been fully restored and, therefore, he was not qualified to serve. But it also found that the Farias "arguably waived [their] right to challenge [Mr. Rieger]'s service" because they did not follow the proper procedure for contesting his service, nor did they seek to obtain a copy of the qualification forms which disclosed Mr. Rieger's conviction, despite having "ample time to learn something about the members of the jury either through the questionnaires or otherwise." Reluctant, however, to dispose of the case on waiver, the district court turned to the fairness of the trial and whether any prejudice resulted from Mr. Rieger's inclusion. The district court concluded that the questions asked during voir dire focused on the potential jurors' experiences in civil matters, and there were no questions about anything to do with the criminal justice system. From this, the district court concluded that Mr. Rieger's silence in response to the questions during voir dire "was appropriate and did not amount to a dishonest nondisclosure." The district court went on, "[Mr. Rieger] told the truth about his record in his questionnaire," and saw "no reason to believe that [Mr. Rieger]'s representation was anything other than a mistaken belief that because his voting rights were restored upon his release from prison that all of his civil rights were restored at that time."

The district court denied the new-trial motion, concluding that the Farias had not shown that Mr. Rieger's "service

deprived [them] of a fundamentally fair trial," and that "the jury was impartial" and the Farias "had a fair trial." The Farias timely appealed and we take the arguments in turn.

## Standard of Review

"Generally, motions for a new trial are committed to the discretion of the district court." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)). Abuse of discretion occurs when our appellate review reveals that the district court erred in its legal rulings or clearly erred in its factual findings. Sampson v. United States, 724 F.3d 150, 161 (1st Cir. 2013); see also United States v. Bater, 594 F.3d 51, 54 n.1 (1st Cir. 2010) (explaining that "'abuse of discretion' is used as well to embrace mistakes on abstract issues of law (reviewed de novo) and errors of fact (for which clear error is the customary test)"). Elaborating on that standard, we have noted that "[w]here the [new-trial] motion rests on a challenge to the qualification of a juror, our standard of review is highly deferential because 'the district court is closer to the action and has a better "feel" for the likelihood that prejudice sprouted.'" United States v. Nickens, 955 F.2d 112, 116 (1st Cir. 1992) (quoting United States v. Uribe, 890 F.2d 554, 562 (1st Cir. 1989)). Further, "[a] trial court's findings on issues of juror credibility and honesty are determinations 'peculiarly within a trial judge's province' and

are accorded great deference."  Amirault v. Fair, 968 F.2d 1404, 1405 (1st Cir. 1992) (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)).

## The System:
## Jury Selection and Service Act, Jury Selection Plan, and Juror Qualification Forms

Before we address the parties' arguments, a general primer on the jury selection system in place at the time of the Farias' trial would be useful.  To put matters in context,[4] the Farias tell us the system broke down when the clerk, on the basis of Mr. Rieger's juror qualification form, allowed the statutorily ineligible felon-juror to slip through the cracks onto this jury. Here's how the system works.

The Jury Selection and Service Act, 28 U.S.C. §§ 1861-1878 (JSSA) directs the District Court of Rhode Island to create a Jury Selection Plan (the "Jury Plan").[5]  See U.S. D. Ct. D.R.I., Jury Selection Plan (Oct. 2013) (hereinafter Jury Plan).  In accordance with the Jury Plan, a master jury wheel is created by selecting names at random from the voter registration lists as maintained by the Secretary of State of Rhode Island. Id. §§ 6(a)-(c).  Names are randomly drawn from the master jury wheel, and the

---

[4]  The parties' arguments are examined more completely and in greater detail in the analysis to come.

[5]  Here, we examine the Jury Plan that was in effect in 2015, when the jury selection in this case took place.

individuals selected receive juror qualification forms.  Id. §§ 7(a), (b).

The qualification forms are designed to screen prospective jurors to ensure that every juror summoned meets the requirements of § 1865(b)(5) of the JSSA, which, in pertinent part, explains that any person is qualified to serve on a jury unless he "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored."  Jury Plan, § 9(e).  In this way, the forms serve as a gate-keeping tool.

The Jury Plan explains:

A judicial officer, upon his or her own initiative or upon recommendation of the Clerk, or the Clerk under supervision of the Court, shall determine solely on the basis of the information provided on the juror qualification form, and other competent evidence, whether a person is unqualified for, or exempt, or to be excused from jury service.

Jury Plan, "Qualification Phase."  And "[t]he Clerk shall enter by electronic means or manually such determination in the space provided on the juror qualification form."  Id. § 9.  So, under the Jury Plan, the clerk or a "judicial officer" reviews the completed forms and determines (on the basis of the information provided on those forms) whether a prospective juror is qualified to serve.  A person determined to be unqualified is not placed on

- 8 -

the "qualified jury wheel" and is, therefore, not subject to summons.

Section 1864 of the JSSA addresses deficient juror qualification forms:

> In any case in which it appears that there is an omission, ambiguity, or error in a form, the clerk or jury commission shall return the form with instructions to the person to make such additions or corrections as may be necessary and to return the form to the clerk or jury commission within ten days.

28 U.S.C. § 1864.

Had the clerk scrutinized Mr. Rieger's qualification form more carefully, he or she would have observed the gaps in information (omissions of conviction date, nature of offense, the name of the court where Mr. Rieger was convicted, the parameters of the sentence imposed, the status of the full restoration of Mr. Rieger's civil rights, and Mr. Rieger's failure to sign the form), and returned the form to Mr. Rieger to be corrected and returned.

Meanwhile, as for challenging the jury selection process, the JSSA provides guidance:

> In civil cases, before the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, any party may move to stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the petit jury.

Id. § 1867(c). And, with respect to how qualification forms may be requested, the JSSA provides:

> The contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except pursuant to the district court plan or as may be necessary in the preparation or presentation of a motion under subsection (a), (b), or (c) of this section . . . . The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion.

Id. § 1867(f).

For its own part, the Jury Plan explains that "[t]he contents of records or papers used by the Clerk in connection with the jury selection process shall not be disclosed, except pursuant to this Plan or upon order of the Court." Jury Plan, § 15(b)(1). Therefore, under certain circumstances, the JSSA and the Jury Plan provide litigants a mechanism -- a motion to the court -- for seeking the release of the juror qualification forms. The Farias did not file such a motion.

With this statutory scheme in mind, we move on to our discussion.

## Waiver

Before addressing the Farias' challenge to the district court's ruling, we must first determine whether, as Harleysville has contended here and below, it has been waived. In arguing waiver, Harleysville points out that in Uribe, a case involving a

- 10 -

post-trial allegation of juror bias arising out of a felon's service on a jury, we noted that, although convicted felons may be statutorily barred from serving as jurors, the JSSA does not present a constitutional bar to their service. 890 F.2d at 561. Instead, we found that "the right to exclude felons must be affirmatively invoked; the [JSSA] establishes strict procedural requirements for challenging ineligible jurors." Id. We also said that a party "must assert his rights 'before the voir dire examination begins, or within seven days after [a party] discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier.'" Id. (quoting § 1867(a));[6] see also § 1867(e) (stating that procedures prescribed by statute comprise "exclusive means" for challenging jurors "not selected in conformity with the provisions of [the JSSA]"). In Uribe, we reasoned that because a felon-juror divulged his prior conviction on his qualification form, and because the forms are available to counsel "upon motion, prior to empanelment, . . . [the litigant] seemingly waived the point." 890 F.2d at 561; see also § 1867(f) (explaining that records used by the clerk in connection with jury selection may be released for the parties to use in preparing a motion under subsection (a), (b), or (c)).

---

[6] Uribe was a criminal matter, hence the reliance on § 1867(a). Here, the applicable subsection is § 1867(c), relating to civil cases, which substantially mirrors subsection (a).

Harleysville says the same goes for the Farias, who arguably committed the same procedural misstep as did the Uribe litigant. Although Mr. Rieger disclosed his conviction on his juror qualification form, the Farias did not try to get a copy of that form before empanelment began or between the completion of voir dire (August 4) and the trial's start date (August 20). And because they failed to follow the procedures prescribed in the JSSA and Jury Plan, the Farias, Harleysville contends, waived any challenge to Mr. Rieger's inclusion on this jury.

The Farias see things differently on the waiver front. Relying on United States v. Schneider, 111 F.3d 197 (1st Cir. 1997), they maintain that our court has clearly backed away from the strict raise-it-or-waive-it rule we seemingly announced in Uribe. In Schneider, we observed that Uribe "stopped just short of a definitive finding that the Rhode Island federal juror selection plan permitted such [unfettered litigant access] to jury questionnaires." Schneider, 111 F.3d at 204 (citing Uribe, 890 F.2d at 561). We went on, "[n]either the statute nor the Rhode Island plan are crystal clear about access to questionnaires," and we questioned whether such forms could be used "solely to aid in the voir dire process." Id. (citing Jewell v. Arctic Enters., Inc., 801 F.2d 11, 13 (1st Cir. 1986)). Given the uncertainty of their access to the forms, the Farias tell us that, absent some reason to believe the clerk had completely failed in his or her

duty to properly screen prospective jurors, they had no reason to suspect a potential problem with Mr. Rieger.  See id. (noting that the complaining party may have moved to gain access to a juror questionnaire, but "before trial he had no basis for such a motion").

The district court found Harleysville's waiver argument persuasive, but given our post-Uribe pronouncements, opted not to decide the new-trial motion on that basis.  For that same reason, we likewise do the same.  Because, even assuming the Farias could have accessed Mr. Rieger's qualification form at some point prior or subsequent to his selection on their jury panel,[7] their claims

---

[7]  We observed in Schneider that we had not yet adopted a position on whether the Rhode Island federal juror selection plan allowed the parties to access juror questionnaires, and also noted that neither § 1867(f) nor the Jury Plan are "crystal clear about access to questionnaires."  111 F.3d at 204.  But Schneider examined a very different Jury Plan, which has since been overhauled, and the iteration in effect in 2015, as we explained in our primer, offers more instruction:  "[t]he contents of records or papers used by the Clerk in connection with the jury selection process" may be disclosed "pursuant to this Plan or upon order of the Court."  Jury Plan, § 15(b)(1).
     Therefore, as noted by the district court, the Farias could have made a § 1867(c) motion to stay proceedings (either before voir dire began, or within seven days after the Farias "discovered or could have discovered, by the exercise of diligence," the grounds for their challenge).  Harleysville points out that the Farias had plenty of time between jury selection and the start of trial to do an exercise-of-due-diligence Google search of the panel members and had they done so, they would have discovered Mr. Rieger's conviction because the Rhode Island Supreme Court's decision affirming that conviction is the first item which pops up in the search (and as of the date of publication of this opinion, our Google search -- "John R. Rieger Rhode Island" -- yielded the

- 13 -

nonetheless fail on the merits.  We therefore turn our attention to the remainder of the arguments.

### The Parties' Analytical Frameworks

The parties take very different views of the analytical lenses through which the remaining issues should be assessed, and we set forth their arguments in some detail.  In advancing their claims, the Farias implore us to be guided by what they contend is the Supreme Court's analysis in McDonough, 464 U.S. 548.  There, after a district court denied a motion for a new trial in a product liability case, the Tenth Circuit reversed, reasoning that the failure of a juror to respond affirmatively to a voir dire question about a family member's injury from an exploding tire, had "prejudiced the [defendants'] right of peremptory challenge," and a new trial was necessary.  Id. at 549.  Subsequently, the Supreme Court reversed the Tenth Circuit, holding that a party is not entitled to a new trial unless the juror's failure to disclose denied the other side its right to an impartial jury.  Id.  But in so ruling, the Court announced "a binary test" that the filer of a new-trial motion based on juror dishonesty must satisfy:  (1) "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire," and (2) the party must "then

---

same result).  Certainly then, they could have filed an appropriate motion, says Harleysville.

- 14 -

further show that a correct response would have provided a valid basis for a challenge for cause."  Id. at 556.

The Farias maintain that once they satisfy this binary test -- and they claim they have done so -- they have met their McDonough burden for obtaining a new trial.  Initially, they do acknowledge that McDonough dealt with juror misinformation given during voir dire rather than during the juror qualification process, but they say it is a difference without a distinction since juror qualification forms "serve[] the same purpose as collecting information from voir dire -- to dismiss unqualified jurors."  "Part and parcel" of screening, they say.  As such, the Farias assert they have met McDonough's first prong (juror answered a material question dishonestly) given that Mr. Rieger lied on his qualification form about the circumstances of his conviction and about the restoration of his civil rights, and further lied through his silence at voir dire when asked if he had ever been a defendant in a case.  As the Farias see it, Mr. Rieger is a man who made a "concerted effort to conceal his criminal history" because he was bound and determined -- for whatever reason -- to sit on this jury, and he deceitfully lied in an effort to achieve that ambition.  As such, they contend the district court clearly erred in finding Mr. Rieger's answers and omissions honest mistakes.[8]

---

[8] As a catch-all, the Farias argue they were at least entitled to a hearing, and the district court's failure to conduct a hearing

As for McDonough's second prong (a juror's correct answer would be the basis for a for-cause challenge), the Farias argue that, had Mr. Rieger provided truthful responses to the questions he was asked both in his juror qualification form and during voir dire, he clearly would have been excused if challenged because he was ineligible to serve.[9]  Therefore, in their view, because they have satisfied the McDonough binary test, the district court's inquiry should have ended.  Accordingly, they say the

on the dishonesty of the answers provided by Mr. Rieger on the qualification form and also at voir dire was clear error. Harleysville counters that the district court concluded that Mr. Rieger did not provide any dishonest answers, and his silence "was appropriate and did not amount to a dishonest nondisclosure." So a hearing is unnecessary because the Farias have not shown that the district court clearly erred.  But, more to the point, Harleysville also says that the Farias never requested a hearing from the district court judge, and in fact, affirmatively represented that a hearing was unnecessary, so that matter should be deemed waived.  We agree.

    [9] Eligibility ties into the requisite civil rights that would need to be in place under § 1865(b)(5) for a felon-juror to serve. Here, Mr. Rieger said yes, his civil rights had been restored.  In actuality, while Mr. Rieger's voting rights were restored, see R.I. Const. art. II, § 1, neither his right to sit on a jury nor his right to seek and hold office had been restored, see R.I. Gen. Laws § 9-9-1.1(c) and R.I. Const. art. III, § 2.  See also Caron v. United States, 524 U.S. 308, 316 (1998) (generally holding that civil rights are understood to include the right to vote, the right to sit on a jury, and the right to seek and hold office); United States v. Hefner, 842 F.2d 731, 732 (4th Cir. 1988); United States v. Green, 532 F. Supp. 2d 211, 212 (D. Mass. 2005).  On appeal, Harleysville does not seem to contest the statutory ineligibility of Mr. Rieger.  But Harleysville does point out that Mr. Rieger clearly provided enough information to put the clerk's office on notice of the felon status and, by extension, probable ineligibility.  If the Farias had made a Schneider request for the forms, as discussed above, they would have been on notice too.

- 16 -

district court abused its discretion (by erring as a matter of law) in not granting them a new trial.[10]

Harleysville, naturally, sees things differently. Harleysville first argues that the Farias' "part and parcel" theory doesn't fly; the test announced in McDonough has nothing to do with qualification forms, but rather applies only to questions asked during voir dire. Harleysville draws a distinction between the two procedures: juror qualification forms serve a gate-keeping function, helping the clerk's office determine who is statutorily eligible to serve on a jury (able to speak and understand English, of age, a citizen of the U.S., and the like), but voir dire safeguards litigants' right to a fair and impartial trial and is a tool to be used to make sure jurors do not harbor biases for or against the parties. See, e.g., Sampson, 724 F.3d at 163-64 (voir dire aims to uncover potential bias or prejudice harbored by prospective jurors); Correia v. Fitzgerald, 354 F.3d 47, 52 (1st

---

[10] We note here that the Farias make no actual attempt before us to demonstrate any bias Mr. Rieger may have harbored or any prejudice they may have suffered as a result of Mr. Rieger's juror participation in their trial. Below, the Farias told the district court that Mr. Rieger's bias stemmed from the nature of his underlying felony, assault with a dangerous weapon, and that bias had a "strong impact on deliberations" at trial. The district court rejected this, and the Farias do not make this assertion on appeal. This is so because, in their view, prejudice is not part of the McDonough calculus: they say "while the District Court frames its argument around 'prejudice,' the case here hinges on the McDonough test, as opposed to some overarching finding of prejudice or bias."

Cir. 2003) (explaining that voir dire's purpose is to make sure jurors "do not harbor biases for or against" the litigants).  This court, says Harleysville, has applied McDonough only in those instances where potential juror dishonesty has been alleged at the voir dire stage, see, e.g., Sampson, 724 F.3d at 163; Crowley v. L.L. Bean, Inc., 303 F.3d 387, 407 (1st Cir. 2002), and as such, the Farias should not be allowed to extend McDonough's holding to qualification forms.

And, Harleysville continues, even if we were to extend McDonough's reach to include juror qualification forms, the Farias still miss the mark because they cannot satisfy the two-prong test, either with the qualification form answers or with Mr. Rieger's silence during voir dire.  On McDonough's first step, as applied to the qualification form, Harleysville contends that Mr. Rieger's qualification form answers were not dishonest; and he provided information in response to those questions which actually outed his felon status.  He even tried to avoid jury service, noting on his qualification form that he "wish[ed] to be excused" due to his felony conviction.  Mr. Rieger's answers, says Harleysville, suggest he is the polar opposite of the determinedly deceitful person the Farias make him out to be.  And although Mr. Rieger did indicate on his qualification form that, yes, his civil rights had been restored -- which the Farias say amounts to deliberate deceit -- Harleysville points out that Mr. Rieger's voting rights (which

- 18 -

he specifically cited on his qualification form) had indeed been restored, meaning Mr. Rieger was not answering dishonestly, or at least not purposefully so. Harleysville also says the Farias fall short on step one of McDonough as applied to voir dire: they argue that the questions asked at voir dire by both sides did not target prior criminal convictions or prior connections to the criminal justice system. And, Harleysville tells us, Mr. Rieger's silence in response to the subject questions, all of which, as we noted earlier, were aimed at uncovering any jury bias relative to personal injury claims, was appropriate.

Because the Farias cannot surmount McDonough's first step, Harleysville argues that we need not reach step two. But it explains the Farias would lose on that front as well: McDonough was focused on whether a nondisclosure by a juror owed specifically to bias, but here, the for-cause challenge to Mr. Rieger would have been based on his § 1865(b)(5) statutory ineligibility, not bias. Accordingly, the Farias have not shown that his inclusion -- while not in conformity with the statute -- impacted the fundamental fairness of the trial, which it asserts is at the heart of the McDonough ruling. The district court, Harleysville says, did not err.

## Our Take

We believe Harleysville has the better argument. Assuming McDonough applies on all fours, it does not help the

Farias' cause. First, we do not believe the Farias meet McDonough's first prong: they have not demonstrated that Mr. Rieger answered dishonestly. 464 U.S. at 556. The district court found that Mr. Rieger "told the truth" and his "yes" answer to the civil-rights-restoration question on the qualification form was reasonable -- at most, the answer given was based on a mistaken reading of the juror qualification form's ambiguous question ("Were your civil rights restored?").[11] This finding of fact was not clear error. Nor was it clear error when the district court found that the voir dire questions focused on the potential jurors' experiences with civil matters, so Mr. Rieger's silence following those questions likewise "was appropriate and did not amount to a dishonest nondisclosure."

Moreover, McDonough does not assist the Farias because they misconceive the core principle of its holding. The binary test set forth in McDonough is not a be-all-end-all test to be viewed without context. Rather, the fundamental purpose of the test is to answer the crucial, overarching trial inquiry: was the

---

[11] We do note, however, that the form does not ask whether *all* civil rights have been restored, so Mr. Rieger's response ("voting rights"), we think, was a fair one -- that right had been restored. Once again, had the clerk sufficiently inspected the form, it would have led to the realization that certain information was not included, but, even so, Mr. Rieger had provided enough information to reveal his felon status. At a minimum, the information Mr. Rieger provided would have been cause to return the form to him for more complete responses.

juror biased and, if so, did that bias affect the fairness of the trial? Put differently, the animating principle of the McDonough test is this: "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." 464 U.S. at 556. The Farias have failed to adequately explain how bias, if any, tainted their trial result.

We have stated that "[t]he party seeking to upset the jury's verdict has the burden of showing the requisite level of bias by a preponderance of the evidence." See Sampson, 724 F.3d at 166 (quoting DeBurgo v. St. Amand, 587 F.3d 61, 71 (1st Cir. 2009)). And, critically, when seeking a new trial because of a juror's nondisclosure, a party "must do more than raise a speculative allegation that the juror's possible bias may have influenced the outcome of the trial." Dall v. Coffin, 970 F.2d 964, 969 (1st Cir. 1992). In such a scenario, we have required litigants to "demonstrate actual prejudice or bias," United States v. Aponte-Suarez, 905 F.2d 483, 492 (1st Cir. 1990), and we have said that the burden of proof on this point "must be sustained not as a matter of speculation, but as a demonstrable reality," Uribe, 890 F.2d at 562. See also Crowley, 303 F.3d at 408 (rejecting a new-trial motion on the basis of alleged juror bias where the movant "only speculates as to whether the juror actually is biased" and "only has alleged 'possible bias'"). As we have said, "hints

-21-

of bias [are] not sufficient," as "only '[d]emonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause.'" Sampson, 724 F.3d at 165 (alterations in original) (quoting McDonough, 464 U.S. at 554). Here, Mr. Rieger's felon status, alone, does not necessarily imply bias, and accordingly his mere presence on the Farias' jury does not, without more, demonstrate an unfair trial result. Uribe, 890 F.2d at 562.

Believing they do not need to make this showing, the Farias, as we noted, have not asserted what particular bias Mr. Rieger harbored or how that bias would have affected the fairness of the trial. Instead, they merely speculate as to the bias and prejudice that resulted. The Farias sweepingly state that Mr. Rieger's dishonest answers "prejudiced Mr. Faria," but offer none of the requisite analysis of discernable bias or prejudice harbored by Mr. Rieger, or how that bias influenced the trial's outcome. Crowley, 303 F.3d at 408; Dall, 970 F.2d at 969; Aponte-Suarez, 905 F.2d at 492; Uribe, 890 F.2d at 562. Thus, it cannot be said that the Farias sustained their burden of setting forth Mr. Rieger's bias as a "demonstrable reality." Uribe, 890 F.2d at 562.[12]

_____

[12] Moreover, as we previously noted, the Farias eschewed the need for an evidentiary hearing to further flesh out any of their fair trial concerns; therefore their claim that the district court erred in not holding a hearing goes nowhere.

Indeed, "[s]hort of constitutional error or some more substantial violation of the JSSA, there must at least be a plausible link between the predicate facts and the prejudice claimed before retrial can be ordered," and, as in Uribe, "[n]one was demonstrated here." Id. at 562. The district court did not clearly err in its finding that Mr. Rieger's inclusion on the jury resulted in no prejudice to the Farias and did not affect the jury's impartiality.

In closing, it is worth remembering the Supreme Court's cautionary note in McDonough. Litigants are not guaranteed a perfect trial, McDonough, 464 U.S. at 553 (noting that "[a litigant] is entitled to a fair trial but not a perfect one"), and we do not reverse for every error that arises, id. ("We have also come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered 'citadels of technicality,'" and "[t]he harmless error rules adopted by this Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial.").

And so, in this instance, we conclude that "the statutory violation -- allowing a convicted felon to serve -- did not implicate the fundamental fairness of the trial . . . ." Uribe,

890 F.2d at 562.  The district court did not abuse its discretion in denying a new trial.

**Affirmed.**  Costs to Appellee.