# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2012

No. 10-50982

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CHEDOWRY THOMAS; HENRY DAVIS; WOODROW CHAPMAN,

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, GARZA, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Chedowry Thomas, Henry Davis, and Woodrow Chapman were tried on counts of conspiracy to possess with intent to distribute a controlled substance and attempt to possess with the intent to distribute a controlled substance. All three appellants were convicted on the conspiracy count. The jury determined that, with respect to Thomas and Davis, the offense involved five kilograms or more of cocaine. Thomas and Davis were also convicted of attempt to possess with the intent to distribute five kilograms or more of cocaine. Chapman was acquitted on the attempt count. All three appealed. We AFFIRM all three judgments of conviction on conspiracy, but we REVERSE the judgments for attempt on the basis of improper venue.

No. 10-50982

## FACTUAL AND PROCEDURAL HISTORY

In March 2008, a confidential source, Victor Jimenez, began working with Ray Thompson, a Special Agent of the Drug Enforcement Administration. The investigation centered on Bernardo Favela, a resident of El Paso, suspected of cocaine and marijuana distribution. Jimenez received information that Favela wanted to deliver 15 kilograms of cocaine to or near St. Louis, Missouri. After notifying Thompson, Jimenez agreed to transport the cocaine to Missouri and stated that he needed to leave on November 23, 2008 to take a legitimate load to Chicago. Favela told Jimenez to call him back later that day to see if he was able to arrange the job. When the call was made, Jimenez was told everything was ready and he should pick up the cocaine from Favela's home in El Paso.

After obtaining the box of cocaine from Favela's residence, Jimenez met with Thompson and other DEA agents who were conducting surveillance. The box contained 15 bundles that weighed a total of 37 pounds. A field test demonstrated that the substance tested positive for cocaine. Thompson took possession of the cocaine and arranged a controlled delivery with DEA agents in Missouri. Jimenez, a truck driver, left that night with a legitimate load to drive from El Paso to Missouri. Thompson flew to Missouri the following day with the cocaine. While Jimenez was on the road, Favela called to give him the name of a contact, "Mr. T," a number to call, and a location to which the cocaine was to be delivered. Instead of St. Louis, Favela told Jimenez to take the cocaine to Charleston, Missouri.

While Jimenez was driving, the DEA agents prepared bundles of sham cocaine with 22 grams of authentic cocaine to resemble the bundles of cocaine Jimenez received in El Paso. The sham cocaine was placed in a red duffel bag and given to Jimenez when he arrived in Missouri. Jimenez then took the bag to a truck stop and called the number given to him by Favela. Jimenez had a number of conversations with Favela and other conversations with another man

2

No. 10-50982

about the delivery of the cocaine. At trial, Chapman's former supervised-release officer, Nicholas Bobo, identified the voice on the phone calls as that of Chapman. During the conversations, Jimenez discussed the location of the transfer, the exchange of money, and the people involved. After several conversations, Jimenez went into the truck-stop restaurant and encountered two men, one with a gold tooth wearing running clothes and another with long hair. Jimenez asked the man wearing running clothes for Mr. T and was directed to a blue van parked next to the restaurant. Jimenez then returned to his truck to receive further instructions from Thompson.

Upon direction from the man on the phone and confirmation from Thompson, Jimenez placed the red duffel bag of sham cocaine in the van. A man in the driver's seat of a blue Cadillac parked next to the blue van instructed Jimenez to open the door to the backseat of the car and retrieve a black duffel bag. The passenger in the Cadillac was the man with the gold tooth and running clothes. Jimenez returned to his truck and met Agent Thompson at the next exit where they opened the black bag to find $16,000. Jimenez was to receive $12,000 and $4,000 was to be sent to Favela.

Officer Jeffrey Wagner, who was advised to be on the lookout for the van and the Cadillac, encountered the vehicles traveling on a county road. He began to pursue the vehicles at 120 miles per hour to overtake the Cadillac, which was behind the van. The van ran off the side of the road and overturned. The driver exited the van and got into the passenger seat of the Cadillac, which then continued for about 150 yards before stopping. Wagner identified the driver of the van as Davis and the driver of the Cadillac as Thomas. Wagner also identified Davis as wearing a blue and red athletic suit on that day. A search of the van recovered the red duffel bag with 15 bundles of sham cocaine.

Thomas, Davis, and Chapman were tried with a fourth defendant, Clark, in the United States District Court for the Western District of Texas for

3

No. 10-50982

conspiracy and for attempt to possess with intent to distribute cocaine. Appellants raise a total of seven issues.

DISCUSSION

*I.     Sufficiency of the Evidence*

Thomas, Davis, and Chapman all argue that there was insufficient evidence to establish they entered into a conspiracy to possess with intent to distribute cocaine. All three moved for acquittal at the close of the government's case and renewed the motion after evidence was presented in defense. We review the denial of a Rule 29 motion for a judgment of acquittal *de novo*. *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation marks and citation omitted).

"To establish a conspiracy [under 21 U.S.C. § 846], the government must prove that: (1) an agreement existed between two or more persons to violate federal narcotics law, (2) the defendant knew of the existence of the agreement, and (3) the defendant voluntarily participated in the conspiracy." *United States v. Ochoa*, 667 F.3d 643, 648 (5th Cir. 2012). "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011) (quotation marks and citation omitted).

"[C]ircumstantial evidence may establish the existence of a conspiracy, as well as an individual's voluntary participation in it." *United States v. Curtis*, 635 F.3d 704, 719 (5th Cir. 2011) (quotation marks and citation omitted). The jury can "infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others." *Id.* (quotation marks and citation omitted). While mere presence at the scene or association with co-conspirators

No. 10-50982

is insufficient, they are factors that may be considered "in finding conspiratorial activity." *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996).

### A.    Davis

Davis argues that the government failed to present evidence demonstrating a shared objective to distribute the drugs or any evidence beyond a buyer-seller relationship.  Specifically, Davis argues that the government did not present circumstantial evidence typical of conspiracy cases such as prolonged cooperation between Davis and his codefendants, a credit agreement, or an established distribution system.

"[A] buyer-seller relationship, without more, will not prove a conspiracy . . . ."  *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993).  "The rule shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties reserved for distributers."  *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc).  The receipt of drugs without payment is "'strong evidence' of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship."  *United States v. Posada-Rios*, 158 F.3d 832, 860 (5th Cir. 1998).

The government presented evidence from which the jury could infer that the defendants were fronted the drugs.  Thompson testified that one kilogram of cocaine was worth $17,000 to $18,000 in El Paso and would increase in value as it was transported away from El Paso.  Based on his testimony, the total amount of the cocaine was worth at least $255,000.  The duffel bag contained only $15,995 in cash.  From this, the jury could infer that Thomas, Davis, and Chapman received the drugs without full payment.

The government also presented evidence from which the jury could infer that Davis acted in concert with Chapman, Thomas, and Favela.  Jimenez testified that he asked a man in running clothes for "Mr. T" and that the man

No. 10-50982

directed him to the van parked next to the restaurant. A government agent who followed Jimenez into the truck stop testified that he saw Davis in the store at the same time wearing a jogging-type suit. The jury could reasonably infer that it was Davis with whom Jimenez spoke in the truck stop. Further, Jimenez testified that the man in the running clothes was the passenger in the Cadillac when he was told to open the back door and retrieve the duffel bag of money. Davis then drove the van from the truck stop and, after the van overturned, ran to the Cadillac driven by Thomas. Finally, Davis, as driver of the van, was entrusted with 15 kilograms of cocaine. "[W]e have inferred knowledge of the conspiracy when the defendant is entrusted to carry a large amount of drugs." *Ochoa*, 667 F.3d at 648.

The jury could reasonably infer from Davis's instruction to Jimenez in the truck stop, presence in the Cadillac when the drugs were placed in the van and the money was retrieved, and action in driving the van from the lot that Davis was an active and knowing participant in a conspiracy with Thomas, Chapman, and Favela. Further, because the drugs were fronted to Thomas, Davis, and Chapman, the evidence was sufficient for the jury to find that the relationship with Favela was more than a buy-sell transaction.

B.    *Thomas*

Thomas argues that there was insufficient evidence at trial to prove that he knowingly either entered into a conspiracy or attempted to possess cocaine. Thomas argues that his only connection to the cocaine was that he was driving the Cadillac at the time it was pulled over by Wagner and that there was no evidence of guilty knowledge. Thomas further argues there was evidence that multiple people walked between the vehicles in the parking lot, and therefore there was no evidence he spoke with Jimenez.

"[K]nowledge of a conspiracy and voluntary participation may be inferred from a collection of circumstances." *United States v. Watkins*, 591 F.3d 780, 788

6

(5th Cir. 2009) (marks and citation omitted).   When Chapman was talking to Jimenez, he stated that he had one of his men at the truck stop prior to the van's arrival, then stated that the van was pulling in to park next to the Cadillac and that "we" were at the truck stop.   Jimenez testified that the driver of the Cadillac directed him to open the backdoor and retrieve the black duffel bag of money.   Although Jimenez did not identify Thomas as the man in the driver's seat of the Cadillac, the government presented evidence from which a juror could infer that Thomas was that individual.   Jimenez testified that the man in the driver's seat was not Clark or the man he spoke with in the store, later identified as Davis.   The government presented evidence that Thomas was driving the Cadillac when it left the lot.   The jury could reasonably infer that Thomas was the man in the driver's seat who directed Jimenez to retrieve the money.

Thomas argues that the government failed to present any evidence of knowledge.   We disagree.   The government presented sufficient evidence that Thomas acted in concert with Davis and Chapman.   There was evidence the Cadillac was parked next to the van for at least half an hour as the parties waited for the drugs to be placed in the van, followed the van with the sham cocaine out of the truck stop parking lot, and then traveled with the van.   When Davis lost control of the van and flipped off of the road, Thomas stopped for him to get into the Cadillac and then continued driving.   In doing so, Thomas and Davis abandoned the van on the side of the road.   The jury could infer that Thomas's actions indicated that he was acting in concert with Davis and that his actions in stopping only long enough for Davis to get into the Cadillac indicated his knowledge of the illegal purpose of the conspiracy.   Although each of these facts alone may have been insufficient to find Thomas's knowing participation in the conspiracy, the collection of circumstances was sufficient to support Thomas's conviction.   There was sufficient evidence to support Thomas's convictions for conspiracy to possess with the intent to distribute cocaine.

No. 10-50982

Thomas also argues that the evidence was insufficient to support his conviction for attempt. Because we determine that venue was improper in the Western District of Texas on the attempt count, we need not address this issue.

### C.    Chapman

Chapman argues the evidence was insufficient to sustain the jury's findings as to his involvement in the conspiracy because the only information linking him to the conspiracy was Bobo's testimony identifying his voice on recorded calls and that testimony was impermissible. As discussed in Part III, the admission of Bobo's testimony identifying Chapman's voice was proper. Because it was properly admitted, the jury could reasonably infer that it was Chapman's voice on the recorded calls with Jimenez.

The recorded conversations demonstrate that Chapman voluntarily participated in the conspiracy. Chapman answered the number Favela instructed Jimenez to contact once he arrived in Missouri. The jury heard Chapman refer to other men at the truck stop as "we" and "us." In one conversation, Chapman states "we got a blue van sitting out, outside" and directs Jimenez to "walk out and put it in the blue van." This is consistent with Davis's directing Jimenez to the van when asked for Mr. T. The government also presented evidence that Chapman and Jimenez discussed whether Jimenez was supposed to get money and Chapman stated he would check. Chapman confirmed that Jimenez would be able to "get something" for the "burritos," which Jimenez testified referred to the cocaine. Chapman also told Jimenez that he was talking to Jimenez's "people down that way." Chapman also acknowledged that Jimenez was attempting to deliver the fifteen burritos. A jury could reasonably infer that Chapman was working in concert with Davis, Thomas, and Favela. The evidence was sufficient to support Chapman's conspiracy conviction.

8

No. 10-50982

*II.    Venue*

Thomas, Davis, and Chapman argue that the district court erred in denying their motions under Federal Rule of Criminal Procedure 29 based on lack of venue for the conspiracy count and, as to Thomas and Davis, on the attempt count.  They argue that venue was improper because the government failed to show that they had any contact with Favela in El Paso.

We review a denial of a Rule 29 motion *de novo.  United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2009).  We will affirm the verdict where a rational jury could conclude "that the government established venue by a preponderance of the evidence." *Id.*  Once again, we view all the evidence in the light most favorable to the government.  *Id.*  To succeed on venue, the government must show that the "trial is occurring in a district where the offense was done." *United States v. Strain*, 396 F.3d 689, 693 (5th Cir. 2005) (quotation marks and citation omitted).

*A.    Conspiracy*

Thomas, Davis, and Chapman argue that the only connection to the Western District of Texas involved Jimenez, who was acting as a government agent.  Because there can be no conspiracy with a government agent, the defendants argue that the government failed to prove any connection between them and the Western District of Texas.

"In cases involving conspiracy offenses, venue is proper in any district where the agreement was formed or an overt act occurred." *Garcia Mendoza*, 587 F.3d at 686 (quotation marks and citation omitted).  "Venue can be based on evidence of any single act that initiated, perpetuated, or completed the crime, and circumstantial evidence suffices to establish venue." *Id.* (citation omitted).

There was evidence that after Jimenez accepted the offer to transport cocaine, Favela had to arrange the delivery in Missouri.  When Jimenez called back, Favela had arranged the exchange.  There was also evidence that Favela

9

gave Jimenez a phone number to contact once he arrived in Missouri. When Jimenez contacted that number, Chapman answered and discussed the logistics of the delivery at the truck stop. Further, Chapman mentioned that he had spoken with Jimenez's "people down that way" while the two were discussing the delivery of the cocaine. This evidence is sufficient to support an inference that Chapman, Thomas, and Davis entered into an agreement with Favela in El Paso.

The defendants also argue that there could be no continuing conspiracy because Jimenez terminated the initial purpose when he gave the authentic cocaine to the government in exchange for sham cocaine. "Because the act of conspiracy is complete upon the formation of an illegal agreement, a defendant can be convicted of conspiracy to aid in the distribution of drugs even if those drugs are fake." *United States v. Burke*, 431 F.3d 883, 886 (5th Cir. 2005). Jimenez's cooperation with the government did not end the conspiracy between Favela and the defendants.

There was sufficient evidence from which a jury could conclude venue was proper in the Western District of Texas on the conspiracy counts.

### B.    *Attempt*

Thomas and Davis argue venue was improper on the attempt count. Chapman was acquitted on that count. Once again, the defendants argue that the actions in the Western District of Texas were separate from the attempt to possess in Missouri because Jimenez turned over the authentic cocaine to the DEA agents. They argue that a new controlled transaction occurred when they received the sham cocaine in Missouri. Finally, Thomas argues that all of the actions by the defendants occurred in Missouri and preparatory acts alone are not enough to support venue.

"[T]o determine whether venue is appropriate, we perform a two-step inquiry: A court must initially identify the conduct constituting the offense (the

nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Clenney*, 434 F.3d 780, 781 (5th Cir. 2005) (quotation marks and citation omitted). To establish the offense of attempt to possess with intent to distribute a controlled substance, the government must show that the defendant "knowingly took a substantial step toward possessing cocaine with the intent to distribute it." *United States v. Redd*, 355 F.3d 866, 872-73 (5th Cir. 2003).

The only evidence regarding Thomas and Davis concerned their actions in Missouri on the day of the arrest. There was no evidence that Thomas or Davis were ever in the Western District of Texas. Nevertheless, the government argues venue was proper because (1) the jury could infer that Chapman made arrangements with Favela in El Paso for the delivery of the cocaine in Missouri and (2) possession with intent to distribute is a continuing offense and the defendants' illegal conduct began in El Paso where the cocaine originated.

We have held that venue is proper in a district where the defendant did not act when the defendant has aided and abetted the commission of the substantive offense that occurred in the district. An individual charged with "aiding and abetting may be tried in the district where the principal committed the substantive crimes." *United States v. Carreon-Palacio*, 267 F.3d 381, 393 (5th Cir. 2001) (quotation marks and citation omitted). In *Carreon-Palacio*, the defendant argued that he was improperly convicted in the Western District of Texas because the evidence established only that he received marijuana in North Carolina. *Id.* at 385, 392. The court determined that venue was proper in the Western District of Texas because the evidence demonstrated that his co-defendants possessed marijuana in the Western District of Texas. *Id.* at 384-85, 393. Because the substantive crime of possession took place there, the defendant was properly convicted on the theory of aiding and abetting in the Western District of Texas even without acting in the district. *Id.* at 393.

11

No. 10-50982

The theory of aiding and abetting does not provide a basis for venue here. Aiding and abetting is an alternate charge in every federal indictment. *United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992). The government, however, did not argue that Thomas or Davis aided and abetted Chapman's attempt nor was the jury instructed on aiding and abetting. We cannot infer that the jury convicted Thomas and Davis on the theory of aiding and abetting where the government did not argue the defendants aided and abetted the crime and the jury was not instructed on the issue. *See, e.g.*, *United States v. Kwong-Wah*, 924 F.2d 298, 301-02 (D.C. Cir. 1991).

We also conclude it is improper to impute the conduct of Thomas and Davis's coconspirators to them to sustain a conviction for attempt. Unlike conspiracy or aiding and abetting, venue for a criminal attempt is based on an individual's actions as opposed to action in concert with others. *Id.* at 302. At least two of our sister circuits have reached a similar conclusion. *See, e.g.*, *id.* at 301-02; *United States v. Foy*, 641 F.3d 455, 467-68 (10th Cir. 2011).

The D.C. Circuit determined that, although venue was proper in the District of Columbia on the conspiracy count, it was improper on the attempt count where the defendant did not act in that jurisdiction. *Kwong-Wah*, 924 F.2d at 301-02. In that case, it was clear that the defendant's coconspirators, while in the District of Columbia, arranged a drug deal to take place in New Jersey. *Id.* at 300. The defendant was only involved in New York or New Jersey. *Id.* Because criminal attempt is not a "group crime," the court held that "[i]f the government wishes to establish venue for an attempt in a district where the defendant did nothing but where the defendant's confederates committed criminal acts, it is required to argue and prove that the defendant specifically aided and abetted those acts and to request that the jury be instructed on the issue." *Id.* at 302. Because the government failed to do so, venue was improper on the attempt count in D.C. *Id.*

12

No. 10-50982

The Tenth Circuit reached a similar conclusion. *Foy*, 641 F.3d at 467-68. The government presented evidence that the defendant had engaged in conversations with a coconspirator to arrange a drug deal. *Id.* at 467. During these conversations, the evidence established that the coconspirator was in Kansas, the place of trial, but did not establish Foy's location. *Id.* The government argued that the coconspirator's presence in Kansas during the conversations was sufficient to establish venue on the attempt to possess with intent to distribute charge. *Id.* The court recognized that the D.C. Circuit and First Circuit had "rejected this type of 'venue by imputation' approach when . . . the crime charged does not require concerted activity." *Id.* The court held that venue was improper on the attempt charge because there was no evidence that "Foy committed any act which constitutes a substantial step toward the commission of the substantive offense in the District of Kansas."[1] *Id.* at 468.

Because we will consider only the conduct of Thomas and Davis individually, the government must show, at the very least, that both Thomas and Davis committed an act in the Western District of Texas.

The government argues that possession with intent to distribute is a continuing offense and the defendants' illegal conduct began in El Paso where the cocaine originated. There is no doubt that possession with intent to distribute can be a continuing offense. *See United States v. Davis*, 666 F.2d 195, 199 & n.5 (5th Cir. Unit B 1982). The defendants, however, must still engage in conduct that would constitute the beginning of the offense. *Cf. Strain*, 396 F.3d at 697 (recognizing that harboring a fugitive may be a continuing offense in circumstances where the offense has actually commenced and it is continued or completed in other districts).

---

[1] We take no position as to whether venue would have been proper on attempt if Thomas and Davis had a telephone conversation to arrange the purchase of cocaine with an individual present in the Western District of Texas.

13

No. 10-50982

The government cites a First Circuit case in support of its argument that venue is proper because the defendants' illegal conduct began in El Paso. *See United States v. Uribe*, 890 F.2d 554, 559 (1st Cir. 1989). In *Uribe*, venue was proper in Rhode Island on a charge of possession with intent to distribute where the defendant placed a call to Rhode Island to arrange for the purchase of cocaine, the cocaine was given to a courier in Rhode Island in response to the order, and then delivered to the defendant in Massachusetts. *Id.* The court held that venue was proper because "the triangular nexuses between the accused, the offense charged, and the forum are solidly conjoined." *Id.* The court held that under those facts, "[t]he sequence was continuous and unbroken." *Id.*

Here, the government has not shown a connection between either defendants' conduct and the district in Texas. The government did not present evidence that either Thomas or Davis placed a call to the Western District of Texas to arrange for the purchase of the cocaine. The only action in the Western District of Texas supported by evidence was that Favela gave the cocaine to Jimenez to transport to Missouri and the inference of Chapman's contact with Favela. As discussed above, it is not proper to impute this conduct to Thomas and Davis on the substantive count of attempt.

Because the government failed to present evidence that Thomas or Davis acted in the Western District of Texas, venue was not proper on the attempt count. We reverse Thomas's and Davis's convictions on that charge.

Where it is clear that a conviction that is being reversed did not cause a district court to impose a harsher sentence on a conviction that is being affirmed, remand for re-sentencing is not necessary. *See United States v. Narviz-Guerra*, 148 F.3d 530, 534 (5th Cir. 1998). Thomas was sentenced to a term of imprisonment of 135 months for each conviction to be served concurrently, a $200 special assessment, and a $2,000 fine. Davis was sentenced to a term of imprisonment of 151 months for each conviction to be served concurrently, a

14

No. 10-50982

$200 special assessment, and a $1,000 fine. We cannot conclude that the attempt count led the district court to impose a harsher sentence on the conspiracy count. Therefore, we do not remand for resentencing, but adjust the special assessment to $100 for Thomas and $100 for Davis.

### III.    *Admissibility of Testimony of Nicholas Bobo*

Chapman argues that Bobo's testimony identifying the voice on recordings of Jimenez's calls as Chapman's voice was inadmissible and violated Federal Rule of Evidence 901(b)(5). Chapman also argues that the admission of Bobo's testimony violated his due process rights because cross-examination of Bobo was limited. "We review a district court's evidentiary rulings for abuse of discretion, subject to harmless-error analysis." *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011) (quotation marks and citation omitted). "[T]o be reversible error, the admission of the evidence in question must have substantially prejudiced the defendant's rights." *Id.* (quotation marks and citation omitted).

At trial, a voice may be identified by an opinion "based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5). Chapman argues that Bobo's minimal contacts were insufficient to provide reliable familiarity with Chapman's voice. Bobo testified that he had spoken with Chapman 47 times over a ten-month period both in person and over the phone. Some of those conversations were as short as five seconds while others were much longer. Bobo's conversations with Chapman over the ten-month period allowed him to connect Chapman's voice with Chapman. "Rule 901(b)(5) merely requires that the witness have some familiarity with the voice which he identifies." *United States v. Cuesta*, 597 F.2d 903, 915 (5th Cir. 1979). Bobo's testimony was therefore permissible under Rule 901(b)(5). *See United States v. Norman*, 415 F.3d 466, 472-73 (5th Cir. 2005).

No. 10-50982

Chapman next argues that Bobo's identification was not objective because Bobo had knowledge that Chapman was being investigated. At trial, Bobo testified that he had been told that the "cassettes were being sent to [him] in regards to an investigation" of Chapman. Bobo's prior knowledge of the investigation goes to the weight and credibility of his testimony, not the admissibility of his testimony. Once a basis for the identification has been shown, "the jury determines the weight to accord the identification testimony." *Cuesta*, 597 F.2d at 915; *see also United States v. Lampton*, 158 F.3d 251, 259 (5th Cir. 1998). The district court did not abuse its discretion in admitting Bobo's testimony identifying Chapman's voice on the recordings.

Finally, Chapman argues that his due process rights were violated because cross-examination of Bobo was limited. Chapman's cross-examination was only limited by his own motion in limine requesting that the parties not mention any term of supervised release, probation or supervision.[2] Cross-examination was limited in that Chapman could not elicit testimony from Bobo regarding Bobo's position as Chapman's former supervised-release officer.

A district court has "wide latitude to impose reasonable limits on cross-examination subject to the Sixth Amendment requirement that sufficient cross-examination be permitted to expose to the jurors facts from which they can draw inferences relating to the reliability of witnesses." *United States v. Martinez*, 151 F.3d 384, 390 (5th Cir. 1998). A district court abuses its discretion if "the limitation was clearly prejudicial, meaning that the defendant demonstrates that a reasonable jury might have had a significantly different impression of the witness's credibility if the defense counsel had been allowed to pursue the

---

[2] Because any limitation on cross-examination was not error, we do not address what the effect might be of Chapman's being the party who filed the motion that caused the limitation.

questioning." *United States v. McCullough*, 631 F.3d 783, 791 (5th Cir. 2011) (quotation marks and citation omitted).

On cross-examination, Chapman was permitted to elicit information from Bobo that would allow jurors to draw inferences relating to his reliability. Chapman was able to question Bobo about the length of their relationship, about racial tension between them, and whether Bobo had been contacted by the NAACP. Chapman also elicited information that he and Bobo were not friends and that Bobo had knowledge of an investigation into Chapman prior to listening to the tapes. Chapman was only limited in that he could not ask Bobo about the specific nature of their professional relationship. Chapman has not shown that a reasonable juror might have a significantly different impression of Bobo's credibility if Chapman had been able to ask about Bobo's position as his former supervised-release officer.

## IV.    *Admission of Thomas's Nonverbal Statement*

Thomas argues that the district court erred in admitting the testimony of DEA agent Homer Markhart. At trial, Markhart testified that he participated in the arrest of Thomas in September 2009, almost one year after the offense. He stated that Thomas was asked to sign a *Miranda* form. After initialing his understanding of each right, though, Thomas refused to sign the form. Thomas agreed to talk without signing the form. Markhart testified he asked Thomas if he was willing to cooperate; Thomas asked what Markhart meant. Markhart said, "We are looking for the owner of the cocaine. You know who it is, right?" Markhart testified that after this statement, Thomas nodded his head to indicate a "yes." Markhart confirmed that Thomas had indicated in November 2008 that he did not know what was in the bag; reports from Thomas's arrest in November 2008 did not contain any information of the owner about the cocaine.

17

No. 10-50982

Thomas argues that Markhart's testimony should not have been admitted because it is not relevant. Even if relevant, he contends its probative value was substantially outweighed by the danger of misleading the jury. At trial, Thomas objected to the testimony on the grounds that he did not waive his Miranda rights, that there were admissions against a co-defendant, and that its admission was prejudicial in violation of his Fourth and Fifth Amendment rights. Because Thomas did not object on the basis on which he now appeals, we review for plain error. *United States v. Williams*, 620 F.3d 483, 488-89 (5th Cir. 2010).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Thomas's knowledge of who owned the cocaine a year later was relevant in that it made it more likely that Thomas associated with the individual who owned the cocaine, knew the person to which Markhart was referring, and was involved in a transaction that involved the cocaine. Relevant evidence may be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

Thomas argues that Markhart's testimony was misleading because the jury could have interpreted the question to elicit information about Thomas's knowledge at the time of offense, not a year later. The jury heard testimony that Markhart's question took place in September 2009 and that the November report indicated that Thomas did not know what was in the bag. The evidence's probative value was not substantially outweighed by a danger of misleading the jury. The district court's admission of Markhart's testimony was not plain error.

18

*V.    Inconsistent Verdicts*

Thomas and Davis argue that they should be acquitted or, in the alternative, that their convictions should be modified to reflect that the offense did not involve five kilograms or more of cocaine.  They argue the verdict was inconsistent because the jury did not find that Chapman's offense involved five kilograms or more of cocaine.

"[I]nconsistent verdicts are not a bar to conviction so long as there is sufficient evidence to support the jury's determination of guilt." *United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999).  The verdict could be a result of "mistake, compromise, or lenity." *United States v. Zuniga-Salinas*, 952 F.2d 876, 878 (5th Cir. 1992) (en banc).  Thomas and Davis argue this case is different because the verdict is inconsistent on a constant fact – the amount of drugs involved – which cannot be enlarged or diminished in the way an actor's culpability can.  Even so, the verdict still could be the result of mistake, compromise, or lenity.  *See id.* at 878.  The verdict is not subject to review for inconsistency.  There is sufficient evidence to support the jury's determination of Thomas's and Davis's guilt.  *See Gieger*, 190 F.3d at 664.

*VI.    Attributing 15 Kilograms of Cocaine in Sentencing*

The district court must find facts relevant to the Sentencing Guidelines by a preponderance of the evidence. *United States v. Greenough*, 669 F.3d 567, 576 (5th Cir. 2012). "This court reviews the district court's findings of fact regarding sentencing for clear error." *United States v. Gonzales*, 436 F.3d 560, 584 (5th Cir. 2006). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (quotation marks and citation omitted).

In making its factual findings, the district court "may consider any evidence which bears sufficient indicia of reliability to support its probable

accuracy." *United States v. Nava*, 624 F.3d 226, 230-31 (5th Cir. 2010) (quotation marks and citation omitted). The district court can rely on information contained in the PSR "so long as the information has some minimum indicium of reliability." *United States v. Olguin*, 643 F.3d 384, 402 (5th Cir. 2011) (quotation marks and citation omitted). It is the defendant's burden to prove "that the information in the PSR cannot be relied on because it is materially untrue, inaccurate, or unreliable." *United States v. Londono*, 285 F.3d 348, 354 (5th Cir. 2002) (quotation marks and citation omitted).

### A.    Davis

Davis argues that the district court clearly erred in finding him responsible for 15 kilograms of cocaine because the testimony of the DEA's chemist did not indicate a precise amount of drugs and because the jury did not find Chapman guilty of an offense involving five kilograms or more of drugs. Davis also argues that the district court should have set his base offense level at 32 instead of 34 because 15 kilograms is on the cusp of offense level 32. *See* U.S. Sentencing Guidelines Manual § 2D1.1(a)(5).

The government offered evidence that Favela asked Jimenez to transport 15 kilograms of cocaine, that the cocaine weighed approximately 37 pounds, that the net weight of the cocaine submitted to the lab was about 15 kilograms, and that Jimenez and Chapman discussed the delivery of "15 burritos." The district court did not clearly err in attributing 15 kilograms to Davis.

### B.    Chapman

Chapman argues that although a defendant is liable for all reasonably foreseeable acts taken in furtherance of the conspiracy, membership in a conspiracy does not result in the foreseeability of all future drug sales. Chapman argues that the evidence does not support an inference that the 15 kilograms of cocaine were reasonably foreseeable to him.

No. 10-50982

There was evidence that Chapman was aware of the amount of drugs being delivered.  In a conversation with Jimenez, Chapman asked "the fifteen, can you bring it in a bag like a tote bag?"  During their conversation, Jimenez also stated that he had fifteen "burritos."  The district court did not clearly err in attributing 15 kilograms of cocaine to Chapman.  *See United States v. Betancourt*, 422 F.3d 240, 246-47 (5th Cir. 2005).

Further, Chapman argues that because the jury did not find that the offense involved more than five kilograms, he should not have been held responsible for the 15 kilograms of cocaine.  The fact that a jury found the government failed to prove a larger quantity of drugs beyond a reasonable doubt "sheds no light on whether a preponderance of the evidence established the larger quantities." *United States v. Jackson*, 596 F.3d 236, 243 (5th Cir. 2010). The district court did not clearly err in attributing 15 kilograms to Chapman.

*VII.   Denying Davis's Minor Role Adjustment*

Whether a defendant "was a minor participant is a factual determination reviewed for clear error." *United States v. McElwee*, 646 F.3d 328, 346 (5th Cir. 2011). Section 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant."   U.S.S.G. § 3B1.2 cmt. n.3(A).   The Sentencing Guidelines commentary defines a minor participant as one "who is less culpable than most other participants, but whose role could not be described as minimal." § 3B1.2 cmt. n.5.  "It is not enough that a defendant does less than other participants; in order to qualify as a minor participant, a defendant must have been peripheral to the advancement of the illicit activity." *McElwee*, 646 F.3d at 346 (quotation marks and citation omitted).

Davis argues that his role was merely to serve as a mule, that his voice was not on any of the audiotapes, his fingerprints were not on the money, the

cocaine or any of the packaging, and that he was not the owner of the drugs. Based on the evidence presented, Davis argues that he is substantially less culpable than other participants and the district court erred in denying his request for a two-level reduction as a minor participant.

A person "merely transporting drugs, a mere 'mule,' is not necessarily a minor participant in the illicit activity." *United States v. Martinez-Larraga*, 517 F.3d 258, 272 (5th Cir. 2008).  Here, Davis spoke with Jimenez in the restaurant, directed him to the van in which he was instructed to place the cocaine, was present when Jimenez placed the cocaine in the van, and later drove the van from the truck stop.  The district court did not clearly err in determining Davis's conduct was not "peripheral to the advancement of the illicit activity." *McElwee*, 646 F.3d at 346 (quotation marks and citation omitted).

## CONCLUSION

We AFFIRM the judgment of conviction and sentences of Thomas, Davis, and Chapman as to Count One.  We REVERSE the judgment of conviction and sentences of Thomas and Davis as to Count Six for lack of venue.  We MODIFY the judgments as to Thomas and Davis to impose only a $100 special assessment.