# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 19, 2013

No. 12-50021

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

ELADIO CLARK-GONZALEZ, III, Also Known as Eladio Clark;
JUAN CARLOS AGUILAR-DIAZ, Also Known as Juan Aguilar-Diaz,

Defendants–Appellants.

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:11-CR-26-10

Before SMITH, HAYNES, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Eladio Clark-Gonzalez ("Clark") and Juan Aguilar-Diaz ("Aguilar") contest the sufficiency of the evidence supporting their convictions of conspiracy to man-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-50021

ufacture and possess with intent to distribute one hundred or more marihuana plants. They also contend that the district court erred by failing to declare a mistrial over the introduction of improper evidence. Moreover, Aguilar maintains that the court plainly erred by allowing testimony that implied he had exercised his right to remain silent. Finding no reversible error, we affirm.

## I.

Clark and Aguilar were charged, along with several others, including Abel Aguilar-Otano ("Abel") and Lazaro Ruiz-Ruiz ("Ruiz"), with conspiracy to possess with intent to distribute and to manufacture one hundred or more marihuana plants, 21 U.S.C. §§ 841(b)(1)(B), 846. Clark, Aguilar, and Ruiz were tried together. Following a five-day jury trial, all three were found guilty of conspiracy, and the jury found that the conspiracy involved at least one hundred marihuana plants.

Abel was a fugitive in Cuba at the time of trial. Sariel Enriquez-Otano ("Sariel"), Abel's cousin, testified that in June or July 2010, he became involved in a marihuana-grow operation with Abel. The two men set the operation up in the garage of a house on Disraeli Street in Pflugerville, Texas, and Sariel resided in the house. Sariel conducted two grows at the Disraeli address and was starting a third crop when the house was raided in December 2010.

During the raids, marihuana-grow operations were found at three houses, and the components for another operation were found at a fourth house. Law enforcement officers found grow operations taking place at a house on Quail Creek that had been occupied by Ruiz and his girlfriend, Yamila Mateos, and at a house on Tuffit owned by Heber Morales. Sariel knew that Morales was conducting a marihuana grow at the Tuffit address and had seen Morales and Abel together several times there. Mateos testified that Abel had been a frequent visitor to the Quail Creek house. Extra cooling systems and specialized

No. 12-50021

electrical systems had to be set up to sustain the grow operations. At all three locations, there were similar air-conditioning systems, and the electrical systems had the same schemes, breaker boxes, and timers, which had been mounted on boards that could be pulled off the walls. Similar types of fertilizers, high-intensity light bulbs, reflective paneling, plant stakes, plant pots, and plant-cloning operations were found at each of those three locations.

II.

Clark and Aguilar moved for a judgment of acquittal at the close of the government's case-in-chief and after the close of all evidence, pursuant to Federal Rule of Criminal Procedure 29. They appeal the denial of those motions, arguing that the evidence was not constitutionally sufficient to support their convictions.

"We review *de novo* the denial of a Rule 29 motion for a judgment of acquittal." *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010). "In determining if there was sufficient evidence to support a conviction, the 'relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In our review of sufficiency, the "only question" before us is whether the jury's "finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012). "Direct and circumstantial evidence are given equal weight, and the evidence need not exclude every reasonable hypothesis of innocence." *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996).

To prove a conspiracy under § 846, the government must show (1) the existence of an agreement between two or more persons to violation federal narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's

No. 12-50021

voluntary participation in the conspiracy. *United States v. Thomas*, 690 F.3d 358, 366 (5th Cir.), *cert. denied*, 133 S. Ct. 673 (2012), *and cert. denied*, 133 S. Ct. 1281, *and cert. denied*, 133 S. Ct. 1743 (2013). "[K]nowledge of a conspiracy and voluntary participation may be inferred from a collection of circumstances." *United States v. Watkins*, 591 F.3d 780, 788 (5th Cir. 2009) (marks and citation omitted). "While mere presence at the scene or association with co-conspirators is insufficient, they are factors that may be considered in finding conspiratorial activity." *Thomas*, 690 F.3d at 366 (internal quotation marks and citation omitted). "[P]lacing a defendant in a climate of activity that reeks of something foul is not enough to support a conspiracy conviction," and "while circumstantial evidence may be particularly valuable in proving the existence of the conspiratorial agreement, we have repeatedly stressed that we will not lightly infer a defendant's knowledge of and participation in a conspiracy." *United States v. Dean*, 59 F.3d 1479, 1485 (5th Cir. 1995) (quotation marks and citation omitted).

Neither defendant disputes the existence of a conspiracy to manufacture and possess with the intent to distribute marihuana. At issue is whether Clark and Aguilar knew of and voluntarily participated in the conspiracy.

A.

Viewing the evidence in a light most favorable to the prosecution, a rational jury could have found Clark guilty beyond a reasonable doubt. First, he was given unusual access to the garage at the Quail Creek house, which was ultimately found to contain a marihuana grow. Mateos testified that Ruiz kept the garage under lock and key and never let her enter it, although he went in every few days. When she asked about the garage, Ruiz told her not to "put [her] nose in it." The first few times the co-conspirators arrived to go to the garage, Ruiz instructed Mateos to go upstairs, to the second floor of the house. After

4

that, she knew to go upstairs on her own. Abel visited the Quail Creek location "twenty, thirty, fifty times" during the six- to eight-month period Mateos lived there with Ruiz. Clark visited three or four times and was permitted to go into the garage at least once. Clark's presence at Quail Creek was corroborated by neighbors who saw his pickup there and wrote down its license plate number. A rational fact-finder could conclude that Ruiz allowed only members of the conspiracy to enter the garage, because he was growing, or setting up to grow, marihuana there.[1]

Second, the evidence at trial, though not conclusive, was at least consistent with the government's theory that Clark installed air-conditioning and electrical wiring in some of the grow houses.[2] The jury heard that Clark had the ability to perform that type of work, that he was seen going into the garage at Quail Creek, that the AC and electrical systems in the three grow houses were similar, and that law enforcement had received information "that [Clark] had done work in the marihuana grow."[3]

Clark contends that the evidence presents a stronger case that William Martin installed the AC and electrical systems observed in the Quail Creek garage on December 21, 2010. In particular, Martin had relevant work experience,

---

[1] Clark contends that the evidence did not prove that a marihuana-grow operation existed at the house on Quail Creek before 2010, and his access to the garage in 2008 cannot, therefore, be connected to the grow operation. A rational jury could have inferred that there was a grow operation, perhaps at an early stage, in 2008 from the facts that Ruiz kept the garage locked during that time and that neighbors first reported suspicious activity there in early 2008.

[2] Sariel testified that he and Abel installed the air conditioning and specialized electrical wiring in the garage on Disraeli.

[3] Detective Dean Peterson testified to that fact on cross-examination. The foundation for his testimony was a post-arrest statement from Clark, which had been excluded by the district court based on *Bruton v. United States*, 391 U.S. 123 (1968). Because Peterson's testimony was directly responsive to a question of opposing counsel, it was not objected to on hearsay grounds.

stayed with Mateos in the Quail Creek house, had a Texas Hydroponics business card, and had equipment in his residence similar to that used in the three grow houses. None of that evidence makes it more plausible that Martin rather than Clark installed the AC and electrical systems. Both were capable and had access to the Quail Creek garage. The remaining evidence may indicate that Martin built the actual grow systems, but it has nothing to do with the AC and electrical systems. In any event, the "jury is free to choose among reasonable constructions of the evidence." *United States v. Pigrum*, 922 F.2d 249, 254 (5th Cir. 1991).

Third, a rational factfinder could conclude that Clark was compensated for his role in the conspiracy. When law enforcement officers raided the Tuffit house, they discovered a paper, which appeared to be a drug-tally sheet, indicating that "Lallin"—Clark's nickname—was owed $1000. Clark offers a number of reasons to discount the evidence—the price and quantity seem too low, several of the notations did not refer to known members of the conspiracy, and one of the notations might refer to an aquarium—but this court must view the evidence in a light most favorable to the government. Additionally, Mateos, possibly at Ruiz's behest, wrote a $2000 check for cash in July 2010, which Clark endorsed. Mateos testified that it was not a rent payment.

Fourth, the government presented evidence that Clark made purchases far in excess of his apparent income. In 2010, he owned two 2009 vehicles and two residences, one of which was worth $145,000. The jury heard that Clark's sole source of income was his work as lead maintenance man at an apartment complex and could reasonably infer that he supplemented his income illicitly.[4]

Fifth, Clark had numerous associations with the conspirators. He allowed Mateos, Ruiz, and Martin to use his address for vehicle registrations and bank

---

[4] *See United States v. Gonzales*, 79 F.3d 413, 424 (5th Cir. 1996) (noting that inconsistency between reported income and expenditures "suggest[ed] income from illicit sources").

No. 12-50021

statements. Ruiz and Mateos lived at his ranch. Clark worked with and supervised Martin and knew and visited Abel. Shortly before the raids, a black SUV registered to Clark was seen arriving at the house on Tuffit. Clark's close association with the conspirators, standing alone, might not be sufficient to support his conviction,[5] but "presence or association is one factor that the jury may rely on, along with other evidence, in finding conspiratorial activity by a defendant." *United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991) (quotation marks and citation omitted). The evidence of Clark's close associations with the conspirators, access to the locked garage at Quail Creek, specialized skills that would have been useful to the conspirators, purchases in excess of legitimate income, and possible payment for services rendered allowed a rational trial of fact to find Clark guilty of conspiracy beyond a reasonable doubt.

## B.

The evidence of Aguilar's knowledge of and voluntary participation in the conspiracy sufficiently supports the verdict. Aguilar was pulled over and arrested in July 2008 while transporting over thirty pounds of high-potency marihuana through Mississippi in a recreational vehicle ("RV"). Although he asserts there was no evidence he had knowledge of the marihuana, a jury could reasonably infer that he did.

Aguilar made a call on his cell phone while seated in the back of the patrol car after being pulled over. During the call, he stated that the vehicle was being checked, that he was in the back seat of a patrol car, and that "they're going to get me for sure." Although it is unclear from Aguilar's cell phone records to whom he was speaking during that conversation, the records show that he received around ten brief calls from Ruiz on the day of the arrest. The jury

---

[5] *See, e.g., United States v. Maltos*, 985 F.2d 743, 747 (5th Cir. 1992); *United States v. Gardea Carrasco*, 830 F.2d 41, 45 (5th Cir. 1987).

heard that this pattern of short calls is common when a supplier is checking on his drug carrier's trip. Also, cell phone records for Aguilar and Ruiz revealed that they frequently communicated with Abel and that the three talked on the day of Aguilar's arrest.

Additionally, a reasonable jury could have connected the marihuana discovered in Aguilar's RV to the conspiracy in two ways. First, the jury heard from an officer, who observed both, that the marihuana found with Aguilar appeared similar to the marihuana seized from the grow houses.[6] Second, although Aguilar lived in Florida, he rented the RV in Austin and paid cash. As the government notes, a jury could reasonably infer that Aguilar rented the trailer in Austin so he could load it with marihuana grown in or near Austin and then transport it to the Eastern United States.

The government contends that this incident alone would allow a reasonable inference of Aguilar's knowledge of and voluntary participation in the broader conspiracy.

> [C]onduct consisting only of involvement in a single transaction may nevertheless be treated as rationally permitting the inference of knowledge of the broader conspiracy where the single act itself shows so much familiarity with or high-level participation in the overall conspiracy as to be in and of itself indicative of the broader conspiracy.

*United States v. Hawkins*, 661 F.2d 436, 454 (5th Cir. Unit B Nov. 1981). In *Hawkins*, we held that the defendant's knowledge of the broader conspiracy could be inferred from his awareness of the use of private planes to transport drugs and from his personal contact and involvement with other members of the

---

[6] Aguilar contends that any link between the two is pure speculation and without any foundation, given that all marihuana looks the same. The officer acknowledged that his testimony was not conclusive—he testified immediately beforehand that he was "not a horticulturist"—still, in connection with the phone calls and other evidence, the testimony as to similarity, in appearance and grade, could have been helpful to the jury.

No. 12-50021

conspiracy. *Id.* Aguilar argues that *Hawkins* is distinguishable, because his transporting nearly $100,000 worth of high-potency marihuana did not make him a high-level participant in the overall conspiracy.

Regardless of whether the jury could have rationally found Aguilar guilty based on his arrest alone, it heard much more evidence. In particular, it heard of Aguilar's connections and associations with the conspirators that rivaled or exceeded Clark's. For instance, Abel and other conspirators made use of a black BMW, registered to Aguilar. Abel once used it to retrieve a package from an unlocked, parked vehicle that was in front of a house the DEA had been watching. The jury heard a DEA task force officer testify that he inferred, therefore, that Abel was involved with drugs. Abel also drove Aguilar's BMW to meet with Ruiz, and the car was spotted at the Quail Creek house. Aguilar was also linked to Mateos, Ruiz, and Morales.

Furthermore, the jury heard that Aguilar met with Morales at one point in a parking lot, where the two exchanged a small object hand-to-hand. Morales came to the meeting from the Tuffit house, where investigators would shortly find marihuana. Aguilar notes that there was no direct evidence that the small object had to do with marihuana, but the jury could have rationally inferred that it had something to do with the conspiracy and therefore that it demonstrated Aguilar's knowledge of and participation in the conspiracy. Based on this evidence, a rational jury could find beyond a reasonable doubt that Aguilar was guilty of conspiracy.[7]

---

[7] Aguilar asserts, in the alternative, that the district court should have granted judgment of acquittal as to the greater offense and should have allowed the jury to consider only the lesser included offense of fewer than one hundred plants. Aguilar offers no arguments or citations to support that assertion, which is without merit—during the 2010 raids, officers found thirty-four marihuana plants growing at the Tuffit house and another seventy-four on Disraeli.

No. 12-50021

### III.

Clark and Aguilar contend that the district court erred by failing to declare a mistrial after the introduction of improper evidence.[8] "When improper evidence is introduced to the jury but a defendant's subsequent motion for mistrial is denied, we review the denial for abuse of discretion and, if we find error, we apply harmless error review." *United States v. Lucas*, 516 F.3d 316, 345 (5th Cir. 2008) (internal citation omitted).

At the end of the second day of trial, Mateos testified that she had moved with Ruiz from Florida to Austin. When the prosecutor asked why they had done so, Ruiz's counsel objected, anticipating her testimony that Ruiz had been involved in a marihuana-grow operation. After the jury had been dismissed for the evening, Mateos stated that Ruiz had been growing marihuana in Florida.

The next morning, Mateos testified, over defense counsel's objection, that Ruiz was "clearly" growing marihuana when the two lived in Florida. Upon further questioning, Mateos clarified that she had never seen Ruiz growing marihuana but assumed he had been because he palled around with a known marihuana grower and would not allow her into a locked area of his house. Ruiz's counsel moved to strike Mateos's testimony, because she had no personal knowledge that Ruiz grew marihuana. Joined by counsel for Aguilar and Clark, Ruiz's counsel also moved for a mistrial because the jury had heard Mateos testify that Ruiz was growing marihuana in Florida.

The court denied the motion for a mistrial but agreed to strike Mateos's testimony. The court informed the jury that it was striking the testimony

---

[8] Clark adopted the portion of Aguilar's brief making this argument by a Federal Rule of Appellate Procedure 28(i) letter. This court has "previously held that an appellant may not raise fact-specific challenges to his own conviction or sentence, such as sufficiency-of-the-evidence challenges or challenges to the application of the sentencing guidelines, by merely referring to similar challenges in another appellant's brief." *United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996). Because this is not a fact-specific challenge, Clark's letter suffices to raise it.

because Mateos lacked personal knowledge and that the jury was not to "consider [it] for any person because you do not know what he did and we can't speculate on it." The court stressed that "it's not admissible evidence, and you shouldn't consider it when you decide the innocence or the guilt of Mr. Ruiz or any of the defendants, for that matter. So I'm just striking it entirely."

Aguilar and Clark assert that, because Mateos's testimony was irreparably prejudicial, the court abused its discretion by failing to declare a mistrial. "A new trial is required only when, after a review of the entire record, it appears that there is a significant possibility that the prejudicial evidence had a substantial impact on the jury verdict." *United States v. Valles*, 484 F.3d 745, 756 (5th Cir. 2007). This court "give[s] great weight to the trial court's assessment of the prejudicial effect of the evidence, and prejudice may be rendered harmless by a curative instruction." *Id.* Where, as here, the court gives the jury a curative instruction, we "presume that such instructions are followed unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the improper statement] is devastating." *United States v. Turner*, 674 F.3d 420, 440 (5th Cir.) (internal quotation marks and citation omitted; alteration in original), *cert. denied*, 133 S. Ct. 302 (2012).

We find no merit in this challenge. Mateos testified that Ruiz was growing marihuana in Florida, but she soon clarified that she merely assumed he was doing so. Her testimony was objected to immediately, then was struck with detailed curative instructions emphasizing that it was speculation with no foundation in Mateos's personal knowledge. Furthermore, the testimony concerned Ruiz's possible grow operation, not Aguilar's and not Clark's. The only, tenuous, connection with Aguilar is Mateos's later testimony that Aguilar and Ruiz were co-workers, coupled with the fact that Aguilar is from Florida. Finally, neither defendant disputes the existence of a conspiracy to grow and distribute mari-

No. 12-50021

huana; at issue is Aguilar's and Clark's knowledge of and voluntary participation in that conspiracy. There is no significant possibility that Mateos's testimony had a substantial impact on the jury's decision on that issue.

IV.

Aguilar maintains that the district court erred by admitting testimony that implied he had exercised his right to remain silent. Because Aguilar failed to object to the testimony, review is for plain error. *See United States v. Garcia-Flores*, 246 F.3d 451, 457 (5th Cir. 2001). Aguilar must show a forfeited error that is clear or obvious and that affects his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he makes such a showing, this court has *discretion* to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

On cross-examination, Aguilar's attorney asked the officer who stopped Aguilar in Mississippi whether he or another officer had informed Aguilar of the reason for his arrest. The officer replied, semi-responsively, "The investigator would advise him of his rights, and I do know that the investigator put 'refused' on his rights." Although Aguilar failed to object at the time, he now argues that the officer improperly commented on his silence, violating his Fifth Amendment right to be free from self-incrimination.

Under the Fourteenth Amendment, the government may not use "a defendant's post-arrest, post-*Miranda* silence to create an inference of guilt." *Garcia-Flores*, 246 F.3d at 455 (citing *Doyle v. Ohio*, 426 U.S. 610 (1976)). The test for a *Doyle* violation is "whether the 'manifest intent' of the remarks was to comment on the defendant's silence, or (stated another way) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *United States v. Pennington*, 20 F.3d 593, 599 (5th Cir. 1994). This court also seeks "to determine whether the

No. 12-50021

remark was a spontaneous comment by the witness or a comment prompted by the prosecutor." *United States v. Moreno*, 185 F.3d 465, 472 (5th Cir. 1999).

Aguilar has not shown that there was an error, much less an obvious one. First, the officer's comment was not elicited by the prosecution during its case-in-chief but by defense counsel on cross-examination. Aguilar points out that the remark was unsolicited, as in fact it was, but there is no evidence that it was anything other than spontaneous.  Second, Aguilar's silence did not come up again; the prosecutor did not mention it in closing argument.  There is no evidence that the government intended to use his silence to create an inference of guilt.  Third, the remark was vague; the jury would not naturally construe it as a comment on Aguilar's silence.  The officer did not say that Aguilar had exercised his rights by refusing to speak but only that the investigator had written "refused" on his rights.  This could mean that Aguilar refused to sign the form acknowledging his rights or perhaps even that he refused his right to counsel.

Finally, even if there was plain error, Aguilar has not shown that it affected his substantial rights.  Given the other evidence of his guilt and the vague nature of the comment, Aguilar has not show a reasonable probability that, but for the error, the result of his trial would have been different.  *See United States v. Martinez-Rios*, 595 F.3d 581, 587 (5th Cir. 2010).

AFFIRMED.

13